2019 IL App (1st) 172085-U

No. 1-17-2085

Third Division
November 13, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 16 CR 811 16 CR 812 |
| DAVID SUTTON, | ) ) ) | Honorable James N. Karahalios, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Connors concurred in the judgment.

**O R D E R**

¶ 1     *Held*: Defendant's convictions for two counts of aggravated battery are vacated and the cause remanded for separate trials where the trial court improperly joined the separate cases in one trial and erred in admitting bad acts evidence.

¶ 2     Following a jury trial, defendant David Sutton was convicted of two counts of aggravated battery (720 ILCS 5/12-3.05(b)(2) (West 2014)) and sentenced to three years' imprisonment on one count and five years' imprisonment on the other, to be served consecutively. On direct appeal, defendant argues that the trial court improperly joined the charges which should have been tried as separate cases and that the trial court improperly admitted bad acts

evidence. For the reasons that follow, we vacate defendant's convictions and remand the cause for separate trials.

¶ 3                                 I. BACKGROUND

¶ 4        On January 11, 2016, defendant was indicted by a grand jury on one count of aggravated battery of M.M. in case number 16-CR-811 and on one count of aggravated battery of G.B. in case number 16-CR-812. Both of the charges stem from incidents occurring on September 27, 2015 at Little City Foundation (Little City), a home for mentally disabled children, where defendant worked as a life skills instructor. As to G.B., the indictment alleged that defendant pulled G.B.'s hair and held his head down. As to M.M., the indictment alleged that defendant grabbed M.M.'s head, pushed M.M.'s head and body against a wall, placed M.M. in a chokehold, and punched and wrestled M.M. to the ground. The indictments also alleged that both of these individuals were severely or profoundly intellectually disabled.

¶ 5                              A. Pre-trial Motions

¶ 6        On May 11, 2016, the State filed a motion to join both cases for trial, or in the alternative, to introduce evidence of each case into the trial of the other as proof of other crimes. Defendant objected to the motion, arguing that the charges involve two separate events with two separate victims and that he would be prejudiced by presenting to the jury different defenses to each charge at the same trial. After hearing the parties' arguments, the court granted the State's motion, stating:

> "So I think that the time that's going to be involved in trying both of them together is going to be a significant judicial economy, economy of the witnesses and of the resources, and you've got affirmative defenses on one. So your concern about prejudice in mixing them together I don't think is enough of a concern given the fact

that apparently there's going to be two drastically different approaches to each of those occurrences."

¶ 7 In defendant's answer to the State's motion for discovery, he asserted the affirmative defense of self-defense and defense of others only in regards to the allegations involving M.M.

¶ 8 On January 5, 2017, defendant filed a motion to allow the introduction of evidence demonstrating that M.M. was a violent and physically aggressive child and that defendant was aware of this prior to September 27, 2015. The State did not object, and the trial court granted the motion.

¶ 9 On February 17, 2017, the State filed a motion to allow evidence of defendant's prior bad acts. This consisted of the testimony of Alayne Mancinelli, who observed two unrelated incidents involving defendant and two other residents of Little City in 2014. On March 9, 2017, the court heard arguments from both parties. The State argued that the evidence of defendant's prior bad acts was "highly probative as to the defendant's frame of mind, his intent, his motive as well as the existence of a *modus operandi* whereby this defendant preys upon these highly vulnerable children and unleashes his anger." The defendant argued that an Illinois Department of Children and Family Services (DCFS) investigation cleared him of all wrongdoing associated with those reported incidents, that the only purpose of the evidence was to improperly show his propensity to act in a similar manner, and that the evidence was more prejudicial than probative.

¶ 10 The trial court granted the State's motion, stating:

"As I view these two additional incidents or allegations of these incidents, I view them as the way in which the Defendant executes his duties in employment of

disciplining children to get them to comply with his idea of proper norms of conduct *** it is alleged [defendant] approaches his duties through the use of physical force in situations, which at least it is alleged, don't call for that force or degree of that force. And in that way, I find that these occurrences are similar so as to qualify for the exception of the introduction of proof of other crimes or bad acts."

¶ 11                                B. Jury Trial

¶ 12        Theresa Moran, the deputy chief of centralized support services at Little City, testified that G.B. and M.M. both resided at Little City in September of 2015, and more specifically were at the Foglia home on the day of the incident. She stated that G.B.'s IQ was estimated to be below 49 and M.M.'s IQ was 42. G.B. was diagnosed with ADHD, and M.M. was diagnosed with autism and a mood disorder.

¶ 13        Moran explained that as a life skills instructor, defendant would have completed state-mandated direct support person training, which includes 40 hours of classroom training and 80 hours of on-the-job training for working with individuals with intellectual and developmental disabilities. He also would have completed crisis prevention training, which teaches de-escalation techniques and physical restraint techniques for crisis management.

¶ 14        Moran testified that defendant indicated in an incident report that on September 27, 2015, M.M. attacked a female staff member in the Foglia home. After receiving a request from the clinical therapist, Moran reviewed the surveillance footage from that day and identified defendant, M.M., and G.B and the incidents involved here. She testified that there were nine different surveillance cameras in the home, and she downloaded the footage from 2:00 p.m. to 3:15 p.m. from the main living area and two hallway cameras.

¶ 15    On cross-examination, Moran acknowledged that she had reviewed M.M.'s monthly behavioral reviews, which indicated 29 incidents of physical aggression, including pulling hair, spitting, pushing, hitting, pinching, kicking, etc., along with nine incidents of property destruction in January 2015. Reviews for February 2015 included 37 incidents of physical aggression and 19 incidents of property destruction. However, between March and August 2015, M.M. had less than ten incidents of physical aggression for each month, though she noted there was an unexplainable discrepancy between the behavioral reviews and the daily logs. Finally, she testified that on September 19, 2015, it was reported that M.M. threw furniture and displayed aggression towards staff members.

¶ 16    Mancinelli, M.M.'s mother, testified that M.M. was diagnosed with autism when he was seven years old and was later diagnosed with a mood disorder. She testified that M.M.'s functional age at the time of this incident was 18 months old. M.M. moved into Little City in July 2013. On September 27, 2015, Manicinelli went to the Foglia home at Little City to pick up M.M. for a weekend visit. Upon her arrival, she observed police vehicles and an ambulance. She also saw defendant outside of the home and he had blood on his face. She found M.M. sitting down in the living room and he was taken to the hospital. She testified that M.M. had a black eye, which was photographed at the hospital and admitted into evidence at trial. On cross-examination, Mancinelli stated that she did not know how M.M. obtained the black eye, that she did not observe any other injuries, and that M.M. was at the hospital for observation of his behaviors and not for any physical injuries. She also testified that she was aware of M.M.'s aggressive behavior.

¶ 17    The State informed the court of its intention to elicit testimony regarding the bad acts evidence. Defendant reasserted his objection to the introduction of this evidence and

requested that the court read the pertinent Illinois pattern jury instruction. The court then read the following to the jury:

"Evidence is about to be received that the defendant has been involved in conduct other than that charged in the indictments. This evidence is being received on the issues of the defendant's frame of mind, intent, motive, consciousness of guilt, and the existence of a modis [*sic*] operandi and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct, and if so, what weight should be given to this evidence on the issues of the defendant's frame of mind, intent, motive, consciousness of guilt, and the existence of a modis [*sic*] operandi."

¶ 18    Mancinelli testified that on November 15, 2014, she went to pick up M.M. from the Spruce home at Little City. She brought food and ice cream with her. Another resident, M.H., asked her what she had. She told him and said she was taking it into the kitchen. As she went to the kitchen, defendant followed her. Billy, another resident, followed them into the kitchen and defendant shoved Billy out of the kitchen and slammed the door in Billy's face. She testified that she thought the action was "utterly just total disrespect" and the door "could have hit [Billy] in the face, could have caught his finger in the door." After she put the food away, she walked into the hallway and M.H. was standing very close to her and trying to talk to her. Defendant told M.H. to step back in a stern voice. Mancinelli continued down the hallway to the office to speak with another staff member. M.H. followed her and defendant yelled at M.H. to step back. M.H. started crying and telling defendant to stop yelling. Defendant grabbed M.H. and pushed him out of the office. She heard noises from the hallway, including yelling, scuffling, thumps against the wall, though she could not see what

was happening. After a minute, she exited the office and did not see M.H. but saw defendant in the living room and he told her that M.H. is "not supposed to be standing so close to [her]." She did not respond to defendant. She stated that she was shocked by the incident, and after she went home, she reported the incident via e-mail to multiple managers and directors at Little City. On cross-examination, she testified that she did not know about M.H. or Billy's specific behavioral problems that Little City was dealing with at the time.

¶ 19    Theresa Fifarek, the manager of the Foglia home during the incident, testified that her duties included supervising the life skills instructors assigned to that home. She testified that G.B. came to Little City in 2014 after his mother died and his family could not provide the necessary supervision. She stated that his exact IQ score was unable to be calculated but it was less than 49. He was diagnosed with ADHD, pervasive developmental disorder, severe mental retardation, and a genetic disorder. She stated that his functional age at the time of the incident was about two years and one month old.

¶ 20    Fifarek testified as to the staff members' training for various behaviors of residents. She stated that staff members are to be supportive when a resident becomes anxious, and in response to physical aggression, "the behavior will be prevented and blocked [and] further attempts to engage in maladaptive behavior will be interrupted and physically blocked" and the staff member will divert eye contact and will not verbally communicate with the resident. She testified that the nonviolent crisis intervention workbook, in response to aggressive behavior, does not provide for putting children in chokeholds, for poking children when they are rocking back and forth, for slamming a child against a wall, for pinning children to the floor, or for punching children.

¶ 21    Fifarek reviewed the surveillance footage of the incident after another staff member informed her of the incident. The video was published to the jury, and Fifarek identified the locations and the individuals—defendant, G.B., and M.M.—in the video. Fifarek specifically noted that defendant can be seen balling his fists. She testified that the "open stance" with open palms and feet hip-width distance apart was the preferred stance for nonviolent crisis intervention. She also testified that when defendant was sitting on the couch, he was also looking at his phone and watching television. She stated that the video showed that defendant initiated contact with M.M. first.

¶ 22    On cross-examination, she testified that putting hands on an individual to prevent an aggressive behavior was "only [a] last resort where an individual was a danger to himself or others," but she acknowledged that the nonviolent crisis prevention handbook includes techniques involving holding an individual's shoulders or blocking attacks that can be used when confronted with physical aggression. She further stated that they are "trained on how to respond in the event that our individuals are displaying aggressive behavior in a nonaggressive way."

¶ 23    Fifarek testified that she reported the incidents involving the residents to DCFS. She and Adrienne Brimie, the human resources manager, met with defendant on September 30 to inform him of the DCFS investigation. During this meeting, she did not observe any injuries to defendant.

¶ 24    Defendant objected to the introduction of the two-hour-long video footage arguing that the video was cumulative and not relevant because it showed defendant sitting around and watching television. The court overruled defendant's objection and published the video

finding that it was relevant evidence as it related to the State's opening statement that defendant was not interacting with the residents or keeping them occupied.

¶ 25    The combined camera views of the surveillance footage showed defendant sitting on the couch in the living room as various residents enter and exit the living room. Early on in the footage, G.B. sits down on the couch and defendant reaches over and grabs G.B. by his hair. Defendant pulls G.B.'s head down towards the couch and holds it there for a few seconds. After defendant releases him, G.B. walks out of the room.

¶ 26    Defendant remains sitting on the couch. M.M. enters and exits the living room several times. About thirty minutes into the video, M.M. is sitting on the couch and defendant reaches over and makes physical contact with M.M.'s back with the back of his hand. M.M. turns around and hits defendant in the head. Defendant then hits M.M. in the head with an open palm. Defendant grabs M.M.'s head with two hands. Defendant releases M.M., and M.M. remains sitting on the couch. Defendant again reaches over and makes physical contact with M.M. with the back of his hand. M.M. stands up and grabs onto the ponytail of another staff member. Defendant walks over and wraps his hand around M.M.'s head and removes M.M.'s hand from the staff member's hair. He then presses M.M.'s head against the hallway wall. Defendant moves M.M. to the opposite wall and wraps his arm around M.M.'s neck. Defendant releases M.M. and M.M. walks out of view. M.M. enters and exits the living room several times. After several minutes, the footage shows M.M. run down the hallway towards defendant. Defendant hits M.M. in the face with his hand and pushes him. M.M. jumps at defendant and hits him in the head. Defendant then hits M.M. in the head with a closed fist. M.M. goes to his room but quickly runs out past defendant down the hallway. M.M. then turns around and jumps at defendant. Defendant restrains M.M. by wrapping his hand around

M.M.'s head. Defendant takes M.M. to the ground and holds him there for a minute. Defendant releases M.M., who then goes to his room. About ten minutes later, the paramedics arrive and take M.M. to the hospital.

¶ 27 Defendant moved for a directed verdict at the close of the State's case, arguing that the State failed to prove that G.B. suffered bodily harm. The court denied defendant's motion, stating that the issue was a question of fact for the jury.

¶ 28 Devonsha Wallace, a Little City life skills instructor, was called to testify for the defense. He testified that he previously worked with M.M. at the Foglia home and had observed M.M.'s aggressive behaviors between June and September of 2015. He also had observed M.M. attack both female and male staff members on occasion. He testified that he has previously used the "child restraint" on M.M., which means to "cross his arms and place your hands over his wrist, but usually if there are other staff members nearby M.M. would "calm down by himself."

¶ 29 Defendant testified that during September 2015 he was working at Little City in the Spruce home as a life skills instructor. He stated that M.M. had previously lived at Spruce home and he was familiar with M.M. On September 27, 2015, defendant was working at Foglia home, however, because they were short staffed in that home. On that day, he was working with Erica and Iana.

¶ 30 In regards to the incident with G.B., defendant stated that when G.B. came over to the couch where defendant was sitting, he "just kind of played with him, [he] grabbed his head, not his hair, [and] pulled him down and was playing around a little bit." He stated that he did not intend to hurt him and G.B. did not cry or make any faces when this happened.

¶ 31    In regards to the incident with M.M., defendant stated that on that day M.M. appeared anxious and hyper because he was rocking and making grunting noises. Defendant reached out to pat M.M. on the back for "reassurance" and to help him "settle down[,]" but instead, M.M. "lunged" at defendant. Defendant placed his hand on M.M.'s torso to stop him. M.M. then stood up, "lunged" at Iana, and grabbed her ponytail. Defendant knew at that time that Iana was pregnant. Defendant took Iana's ponytail at the base and slid M.M.'s hand off, which he testified he was trained to do. He then attempted to put M.M. in a wall restraint, which he testified he learned at the Little City staff orientation. He described a wall restraint as: "where you have a client against a wall, and one hand is on the shoulder, the other hand is on the wrist, and your leg is, like, between their legs, one by the foot an then your knee behind their kneecap." He stated that the wall restraint is meant to be conducted with two staff members, but Iana ran out of the living room. After defendant released M.M., he told him to go to his room several times. M.M. jumped at defendant and pulled him to the ground, and the other two staff members, who were in the hallway, exited and closed the door. Defendant attempted to put M.M. in a floor restraint but M.M. started to kick him. Eventually, M.M. calmed down and went to his room.

¶ 32    During the altercation, Erica called 911 and defendant waited at the Foglia home until the paramedics arrived. Defendant had scratches on his face and chest and his shirt was torn. He testified that he did not observe any injuries to M.M. following this encounter and he did not hear M.M. making any noises that would indicate that he had been injured. Defendant further testified that he had observed M.M. be physically aggressive with staff members in the past. Prior to this incident, defendant had never used physical restraints on M.M. He testified that

following this incident he was terminated from his position with Little City and there was a DCFS investigation.

¶ 33    Defendant also testified regarding the incidents that Mancinelli observed in 2014. Defendant stated that M.H. was hyperactive, excitable, and highly sexualized. He explained that M.H. would "strip and run around the house *** and try to make contact with female employees. He smeared feces in his room, and he would get real excited when he didn't get his own way a lot of times and start throwing things in his room." M.H. was required to maintain an arm's length distance with female employees and visitors. Defendant testified that M.H. was standing "uncomfortably close" to Mancinelli, so he told M.H. to "watch [his] space" and then assisted a different resident in the restroom. Defendant testified that he did not know what Mancinelli was referring to when she said she heard noises in the hallway as he did not make any physical contact with M.H.

¶ 34    As to Billy, defendant testified that when Mancinelli brought in the food, Billy was closely following her. Defendant stated that Billy also had highly sexualized behaviors. After he and Mancinelli entered the kitchen, defendant held up his hand towards Billy and shut the kitchen door. He testified that he did not slam the door in Billy's face and there was no risk of harm to Billy. Following these incidents, defendant was investigated by DCFS, but DCFS determined that the claims were unfounded. He received no discipline at Little City as a result of these incidents.

¶ 35    On cross-examination, defendant testified that the tactics he used with M.M. were to protect himself and calm down M.M. without causing pain to M.M. and that these were taught in his Little City training. He testified that in the video he was watching television but

he was also monitoring residents and had a good vantage point for doing so from the couch. He stated that he also made his rounds as necessary.

¶ 36   Defendant renewed his motion for a directed verdict, which the trial court denied. The jury received their instructions, which included instructions on defense of others and self-defense. The jury found defendant guilty of both charges of aggravated battery. Defendant subsequently moved for a judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial, which included, among other claims, claims of improper joinder and error in admitting Mancinelli's testimony regarding the 2014 incidents. Following a hearing, the trial court sentenced defendant to consecutive sentences of three years' and five years' imprisonment.

¶ 37   While this appeal was pending, defendant filed a motion pursuant to Rule 21(a) of the Illinois First District Appellate Court (eff. Sept. 1, 2004), requesting that this court consider the DVD video that was admitted at trial. We ordered the motion taken with the case. Defendant's motion is granted as a viewing of the DVD is necessary for our resolution of this appeal.

¶ 38                                    II. ANALYSIS

¶ 39                                 A. Joinder of Charges

¶ 40   Defendant first claims that he was denied a fair trial where the trial court improperly joined his cases because the two charges of aggravated battery were not part of the same comprehensive transaction. He asserts that the court's error was not harmless and reversal of his convictions is warranted. We agree with defendant and conclude that the charges should not have been joined for the following reasons.

¶ 41                          1. Same Comprehensive Transaction

¶ 42    Pursuant to section 114-7 of the Code of Criminal Procedure of 1963, the trial court may order two or more charges to be tried together against a criminal defendant if the offenses could have been joined in a single charge. 725 ILCS 5/114-7 (West 2014); *People v. Patterson*, 245 Ill. App. 3d 586, 587 (1993). "Two or more offenses may be charged in the same [charging instrument] in a separate count for each offense if the offenses charged *** are based on the same act or on two or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2014). The four factors in determining whether two or more offenses are part of the "same comprehensive transaction" include: (1) proximity of time and location of the offenses; (2) the identity of evidence needed to demonstrate a link between the offenses; (3) whether there was a common method in the offenses; and (4) whether the same or similar evidence would establish the elements of the offenses. *People v. Walston*, 386 Ill. App. 3d 598, 601 (2008). The first two factors are considered to be the "most important." *People v. Quiroz*, 257 Ill. App. 3d 576, 586 (1993). If it appears that the defendant may be prejudiced by a joinder of related prosecutions, the court may deny the request for joinder. 725 ILCS 5/114-8(a) (West 2014). The decision of whether to join separate charges is a matter within the sound discretion of the trial court, and we will not reverse that decision absent an abuse of that discretion. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38. Abuse of discretion is found where the trial court's decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view." *Id.*

¶ 43    We first note that judicial economy is an improper consideration in the analysis of whether joinder is appropriate under the statute because "joinder will in most cases expedite the judicial process." *Walston*, 386 Ill. App. 3d at 601-02. We acknowledge that "judicial

efficiency has no bearing on the controlling issue of whether multiple offenses are part of the same comprehensive transaction." *Id*. Here, the trial court stated that trying both charges together in one trial would be of "significant judicial economy," specifically in regards to the witnesses and resources needed to try the cases. The record does not show whether the court adequately considered any of the requisite factors nor are there any explicit conclusions as to whether the charges were part of the same comprehensive transaction. Nonetheless, we find that the record is sufficient to determine whether the charges were part of the same comprehensive transaction.

¶ 44    The first factor weighs in favor of joinder where the two incidents involving M.M. and G.B. occurred within two hours of each other in the Foglia home. Therefore, the offenses share proximity of time and location.

¶ 45    The second factor asks not whether evidence of the two crimes is similar or identical, but whether the court can identify evidence linking the crimes. *Walston*, 386 Ill. App. 3d at 605. This court's analysis in *People v. Quiroz* is instructive as to how this factor may be established. There, the defendant's charges of shooting two victims and using a gun to steal the third victim's car were joined in one trial. *Quiroz*, 257 Ill. App. 3d at 586. This court upheld the joinder, finding that there was evidence linking the two shootings to the armed robbery, namely that the armed robbery was conducted to enable defendant to flee from the scene of the shootings. *Id.* In contrast, there is no evidence here that links the two alleged batteries, except for the fact that defendant was at work during both incidents. Thus, this factor does not weigh in favor of joinder.

¶ 46    The third factor—whether the offenses share a common method—considers "whether the offenses were part of a 'common scheme,' so that each of the offenses supplies a piece of a

larger criminal endeavor." *Walston*, 386 Ill. App. 3d at 606-07. This court has found this factor present where all three crimes were part of a common scheme (*Quiroz*, 257 Ill. App. 3d at 586) or where the second crime was an outgrowth of the first (*People v. Reynolds*, 116 Ill. App. 3d 328, 335 (1983)). Neither of those scenarios is present here. Thus, there is no evidence that the batteries were part of a common criminal endeavor. The allegations of battery were separate, independent acts with separate victims and this factor weighs against joinder. See *People v. Hayden*, 2018 IL App (4th) 160035, ¶ 105 (finding joinder improper where two sexual offenses with many similarities were separate transactions as they involved separate victims, though they also occurred years apart). This factor then weighs against joinder.

¶ 47    Finally, the fourth factor considers whether the same or similar evidence would establish the elements of the offenses. There must be some commonality of evidence. See *People v. Johnson*, 2013 IL App (2d) 110535 (finding this factor did not apply because there is no commonality of evidence between unlawful possession of a handgun and domestic battery). Here, the evidence required to establish the elements of each battery charge would not be the same. The statutory provision under which defendant was charged requires the State to prove that defendant "cause[d] bodily harm or disability or disfigurement *** to any person with a severe or profound intellectual disability." 725 ILCS 5/12-3.05(b)(2) (West 2014). The State needed to separately prove the mental disabilities of the residents and the actions defendant took that caused bodily harm. Stated another way, the allegations involving M.M. do nothing to prove the allegations involving G.B. and vice versa. Therefore, this factor does not weigh in favor of joinder.

¶ 48        Our analysis of the factors demonstrates that defendant's alleged batteries against the two residents of the Foglia home are not part of the same comprehensive transaction. Despite occurring close in time and location to one another, the crimes are not linked, are not part of a larger criminal endeavor, and do not share the same evidence. Moreover, merely because the offenses are similar in nature, *i.e.* defendant using unwarranted physical force against the residents to correct their behavior, does not make them a " 'united, continuous and indivisible act.' " *People v. Hayden*, 2018 IL App (4th) 160035, ¶ 105 (quoting *People v. Perello*, 350 Ill. 231, 235 (1932)). Thus, we find that joinder was inappropriate in this case and that the trial court abused its discretion in joining the two battery charges in one trial. See *Johnson*, 2013 IL App (2d) 110535, ¶ 53.

¶ 49                                    2. Prejudice to Defendant

¶ 50        However, joinder error only requires reversal of the judgment if the error caused prejudice to the defendant. *Walston*, 386 Ill. App. 3d at 609. The State contends that even if joinder was in error, defendant was not prejudiced by it. Defendant, on the other hand, argues that severance of his charges would have resulted in the exclusion of evidence that the State presented in his trial on both charges. We agree with defendant and find that the joinder was not harmless.

¶ 51        Joinder is "harmless where the evidence of all of the charged crimes would have been admissible in the separate trials that would have taken place". *Walston,* 386 Ill. App. 3d at 609. Although separate trials for the two charges will include reliable evidence of M.M. and G.B.'s respective mental disabilities and the relevant video footage, as we discuss below, evidence of the other charge of aggravated battery would not be admissible.

¶ 52    Evidence of the other battery charge would constitute bad acts evidence, which includes "misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is standing trial." *Johnson*, 2013 IL App (2d) 110535, ¶ 61. Such evidence "is normally inadmissible if offered to demonstrate the defendant's bad character or his propensity to commit crime." *Walston*, 386 Ill. App. 3d at 609-10. The reason why propensity evidence is inadmissible is because it "overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment." *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). However, this type of evidence can be admissible "to prove any material fact relevant to the case" if it shows *modus operandi*, intent, motive, identity, or absence of mistake. *Johnson*, 2013 IL App (2d) 110535, ¶ 61; *People v. Pikes*, 2013 IL 115171, ¶¶ 11-12.

¶ 53    Here, including evidence of the other battery charge would only serve as propensity evidence because there is no non-propensity purpose for admitting the evidence. Defendant's defenses to the charges against him were that he did not harm G.B. when he touched him and he was justified in touching M.M. Defendant's physical contact with one resident on that day would not prove his intent or motive, if there was one, for his contact with another resident. Further, his identity is not at issue, and similarly, neither is his *modus operandi*. See *People v. Boyd*, 366 Ill. App. 3d 84, 92 ("*Modus operandi* evidence ordinarily is not relevant where identity is not at issue."). Finally, defendant does not argue that the physical contact was mistaken. Thus, the only purpose we can find for admitting such evidence would be to show defendant's propensity to become physically aggressive with residents. See *Johnson*, 2013 IL App (2d) 110535, ¶ 61 (stating that bad acts evidence is "inadmissible if it is relevant only to demonstrate a defendant's propensity to engage in criminal activity").

¶ 54    Moreover, the admission of evidence of the other battery charge would likely create a "mini-trial" of that offense within the trial, where multiple witnesses would need to testify as to the circumstances surrounding the other battery charge. See *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). This would cause jury confusion and unnecessary delay, which are other reasons for the inadmissibility of bad acts evidence. *Walston*, 386 Ill. App. 3d at 620.

¶ 55    Further, as discussed below, the evidence of 2014 incidents would also not be admitted at either trial because it is propensity evidence. The absence of this prejudicial evidence could affect the likelihood of conviction for one or both charges where there would be separate trials for each.

¶ 56    In sum, evidence of both battery charges and evidence of the 2014 incidents constituted inadmissible propensity evidence, and there is a reasonable probability that the jury found defendant guilty of both charges after considering this improper evidence. See *Johnson*, 2013 IL App (2d) 110535, ¶ 58. Without this evidence, we cannot say that the properly admitted evidence at separate trials would be so overwhelming that it would be impossible for a reasonable jury to find defendant not guilty of either of the charges or both. See *Hayden*, 2018 IL App (4th) 160035, ¶ 136. Accordingly, we believe that joinder of the charges was prejudicial. See *Johnson*, 2013 IL App (2d) 110535, ¶ 58 ("The fundamental fairness of the proceedings was compromised.").

¶ 57                                B. Bad Acts Evidence

¶ 58    In addition to arguing that the joinder was not harmless, defendant contends that the trial court should not have admitted (1) Mancinelli's testimony regarding the 2014 incidents and (2) the two-hour surveillance video that showed him being "lazy" while working. Because

we anticipate that this issue will arise on remand, we address defendant's argument that he was prejudiced by the trial court's admission of this evidence.

¶ 59                                    1. 2014 Incidents

¶ 60        Defendant claims that there was no non-propensity basis for admitting Mancinelli's testimony regarding her observations of the 2014 incidents. He also argues that the evidence should not have been admitted because it was more prejudicial than probative.

¶ 61        "[A]ll relevant evidence is admissible unless otherwise provided by law." *People v. Cruz*, 162 Ill. 2d 314, 348 (1994). But, if the probative value of such evidence is outweighed by its prejudicial effect, the trial court may exclude the relevant evidence. *Id.* Further, "evidence that the defendant in a criminal case has engaged in other bad acts on a different occasion is not admissible to show that the defendant has a propensity to commit crime." *People v. Clark*, 2015 IL App (1st) 131678, ¶ 27. The courts disfavor the inference that because an individual has previously committed crimes or similar bad acts he is more likely to have committed the current crime for which he is on trial. *Cruz*, 162 Ill. 2d at 348. This rule was codified in the Illinois Rules of Evidence under Rule 404(b) (eff. Jan. 1, 2011), which provides that, with some exceptions not pertinent here, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith[.]" It may, however, be admissible for purposes other than propensity, such as to show *modus operandi*, intent, motive, identity, or absence of mistake. *Pikes*, 2013 IL 115171, ¶¶ 11-12. Nonetheless, the trial court must still weigh the probative value of the evidence against its prejudicial effect. *People v. Lewis*, 2015 IL App (1st) 130171, ¶ 47.

¶ 62        The trial court's ruling on the admissibility of bad acts evidence will not be reversed absent a clear abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). Abuse of

discretion is found where the trial court's decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view." *Fleming*, 2014 IL App (1st) 113004, ¶ 38.

¶ 63    It is unclear to this court precisely for which purpose the trial court admitted the evidence. In ruling on the State's motion regarding this evidence, the trial court mentioned that the 2014 incidents were similar enough to the current charges to qualify as an exception to the bar against bad acts evidence. The court later gave the jury a limiting instruction stating that the evidence was only to be considered as proof of defendant's frame of mind, intent, motive, consciousness of guilt, and *modus operandi*. We find that none of these purposes were served by the admission of Mancinelli's testimony regarding the 2014 incidents.

¶ 64    Once again, defendant's defenses to the charges against him were that he did not harm G.B. when he touched him and he was justified in touching M.M. He did not argue that he did not intend to touch either of them or that the touching was accidental. He also did not argue that it was not him who touched either of the residents. Accordingly, the 2014 incidents had no probative value as to intent, identity, or consciousness of guilt. There is also no probative value as to *modus operandi* because that purpose is intertwined with that of identity. See *People v. Berry*, 244 Ill. App. 3d 14, 21 (1991) ("The *modus operandi* or 'method of working' exception refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person."). As to motive, nothing about the 2014 incidents indicates what drove defendant to commit these subsequent batteries, assuming defendant even had a conscious motive.

¶ 65        We conclude that the trial court abused its discretion in admitting Mancinelli's testimony as to the prior incidents where none of the exceptions to admitting bad acts were applicable. The only purpose served by such evidence was an improper showing of defendant's propensity to act in a similar manner a year later. Furthermore, the admission of this testimony created a mini-trial, where additional testimony was necessary to provide a complete picture of the incidents. See *People v. Rosado*, 2017 IL App (1st) 143741, ¶ 36 (stating that the admission of this type of evidence has the potential to create a "mini-trial" that could "confuse the jury and waste time"). Although the prejudicial effect of Mancinelli's testimony was diminished by testimony that DCFS's investigation determined the claims to be unfounded and also by the trial court's limiting instruction, there was not any permissible probative value served by this evidence.

¶ 66        We need not determine whether the admission of this evidence was harmless because we are remanding for separate trials. However, we have found that this evidence constitutes inadmissible propensity evidence, it should not be admitted at either trial, regardless of its arguably "harmless" effects in light of the other evidence introduced.

¶ 67                          2. Surveillance Video

¶ 68        Defendant also claims that the two-hour surveillance video should not have been admitted into evidence at trial because it constitutes bad acts evidence as it shows him being "lazy" and watching television and is not relevant to the allegations of battery.

¶ 69        The State argues that defendant has forfeited this issue because he did not include it in his posttrial motion. We agree. Our courts have repeatedly held that to preserve an issue for review a defendant must object contemporaneously at trial and raise the error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (holding that an issue is

preserved by contemporaneous objection at trial and by written posttrial motion). Additionally, defendant did not request that this issue should be reviewed under the plain error doctrine. See *Ramsey*, 239 Ill. 2d at 412 ("In the absence of a plain-error argument by a defendant, we will generally honor the defendant's procedural default."). Regardless, because we are remanding this case for separate trials and, as we have stated, evidence of the other battery charge would not be admissible, it is unnecessary for us to determine whether the trial court erred in admitting the entire two-hour surveillance video. If proffered on remand, the video will require editing to show only the portion associated with the battery charge being tried, and therefore, much of the footage showing defendant "being lazy" will no longer be included.

¶ 70                                    III. CONCLUSION

¶ 71        For the reasons stated, we vacate the judgment of the Circuit Court of Cook County and remand the cause for separate trials.

¶ 72        Vacated and remanded.