THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER QUIROZ, Defendant-Appellant.

First District (6th Division)   No. 1—92—1155

Opinion filed November 29, 1993.

Rita A. Fry, Public Defender, of Chicago (Lynn Flanagan Wilson, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Maureen E. McGee, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Following a jury trial, defendant, Peter Quiroz, was found guilty of first degree murder, armed robbery and aggravated battery. He was sentenced to a concurrent term of 50 years for murder, 30 years for aggravated battery and 15 years for armed robbery. Defendant appeals pursuant to Supreme Court Rule 602. 134 Ill. 2d R. 602.

Defendant raises the following issues for review: (1) whether the State presented sufficient evidence to prove him guilty of armed robbery; (2) whether certain comments by the prosecutor made during closing arguments constituted prejudicial error; (3) whether the trial court erred in denying defendant's motion to sever the counts of his indictment relating to murder and aggravated battery from the counts of the indictment which related to armed robbery; and (4) whether the Illinois murder statutes are constitutional.

On January 1, 1991, Lillian and Atanasio (Mike) Solis of 2435 S. Springfield were sitting in their dining room with Lillian's 22-year-old son, Manuel Medina (Sonny), their daughter Beverly and Beverly's boyfriend. Lillian testified that at approximately 3 a.m., the group heard noise and glass breaking from outside and Sonny went to the window. Sonny saw people fighting outside and called the police. When Sonny heard the name "Albert" being called outside, he ran out the front door and down the stairs without a coat or shoes. Sonny's stepfather, Mike Solis, ran out after him. Lillian Solis stood in the front doorway watching. Lillian testified that she watched as Sonny and Mike returned to the house and crossed the street walking towards her. She then stated that Sonny grabbed Mike and pulled him to the ground. She indicated that she watched as someone shot Sonny from the middle of the street and then ran south down Springfield. She estimated that the gunman stood approximately 10 feet away from Sonny as he shot.

Mike Solis next testified that he was sitting with Sonny and his family at 3 a.m. that morning when Sonny ran out of the house. Mike followed Sonny and tried to break up a fight that was occurring

just up the street. They were unable to break up the fight, so Mike said to Sonny, "Let's go home, let them fight it out." As they were halfway across the street gunshots were fired. Sonny knocked Mike to the ground and dragged him across the street. Once they reached the driveway located at 2428 S. Springfield, Sonny jumped on top of Mike to protect him and two more gunshots were fired. Mike rolled out from under Sonny and heard someone say "He is shot." Mike testified that when he looked Sonny was not moving.

Alice and Felipe Alvarez lived at 2439 S. Springfield and also heard a commotion outside that evening. Alice testified that she heard her son's name, Albert, being called so she jumped up and went to the front window. She and her husband saw people fighting outside, so they ran downstairs and looked out the door. They saw defendant, whom they had seen before, shooting a gun. He shot twice from the sidewalk and then twice from the middle of the street. Defendant then went to a driveway across the street from the Alvarez's house where Sonny and Mike were lying on the ground by a car. Both Alice and Felipe testified that defendant pointed the gun at Sonny and shot two more times. After shooting Sonny, defendant ran down the street toward his house, which was south of the Alvarez home. Both Alice and Felipe picked defendant out of a police lineup later that day.

Arthur Perez testified that his family lives at 2428 S. Springfield. He and his brother Al Perez lived there with their parents on January 1, 1991. On that evening, the Perez family had a family party. At approximately 3 a.m., and after being told that Al was outside, Arthur went out to see if his brother was okay. While outside, Arthur saw Sonny and Mike coming from their house. They greeted each other and wished one another a Happy New Year. While standing with Sonny and Mike, Arthur heard shooting. Arthur told everyone to get into the house and Sonny and Mike ran toward Arthur's house. Arthur looked towards the area from where the sounds of the shots were coming and saw defendant shooting a gun. Defendant fired three shots while in the middle of the street and then walked up to Sonny and shot him. Arthur was about 10 feet away from Sonny when defendant shot. After defendant shot Sonny, he pointed the gun at Arthur. Arthur said, "You did enough, go" and defendant took the gun and left, running towards his house. Arthur Perez went over to Sonny and saw him lying there. He then went into the house to call the police and an ambulance and found out that his brother-in-law, Jaime Tejeda, had also been shot.

Jaime Tejeda testified that during the early morning hours of January 1, 1991, he was at a party at the Perez house. At approxi-

mately 3 a.m., he heard the commotion outside and went to see what was happening. When he went outside, he saw Sonny and Mike. Jaime saw defendant in the middle of the street with a gun in his hand. Defendant came from the middle of the block over to where Jaime was standing. Sonny and Mike were on the ground right behind Jaime. Jaime heard gunshots and ducked. Defendant then walked up to Jaime and shot him point blank. Jaime tried to shield himself with his left hand. Jaime testified that he was shot in his left hand and that the bullet went through his hand, into his chest and ended up in his stomach. After shooting Jaime, defendant retreated and Jaime crawled back into his brother-in-law's house. Jaime Tejeda was taken to Rush-Presbyterian Hospital.

Chicago police officers William Pierucci and James Scott responded to a call of "either shots fired or a gang fight" at 2428 S. Springfield. Upon their arrival, they saw Sonny lying face down on the driveway. They also learned that Jaime Tejeda was shot. They spoke to Lillian Solis and Felipe Alvarez. After speaking to Felipe, they went to defendant's home, they noticed that the front door was open and there was blood on the stairs leading up to the second floor. It appeared as though a party had taken place and there was blood all over the apartment. After leaving defendant's house, the officers went to Mt. Sinai Hospital and learned that Chris Mendoza and Paul Hernandez had also been shot that night.

Ramon Salgado testified that at approximately 4 a.m. on January 1, 1991, he and his brother, Martin Salgado, were dropping off their friend, Solja, at her home near 24th Street and Pulaski. Ramon, who was driving Martin's car, double parked the car in the middle of the street near an alley. While standing outside the car, Ramon saw defendant in the alley throwing rocks or snow at a second-floor window. Defendant walked up to Ramon Salgado, pointed a gun at him, got in Martin Salgado's car and drove away. The following morning Ramon Salgado identified defendant as the man who took his brother's car.

On January 1, 1991, at approximately 8 a.m., Chicago police officer Salvatore Esparza went to defendant's house looking for defendant but he was not home. Officer Esparza then went to Albert Quiroz's girlfriend's house but defendant was not there either. Later that day, around 3:55 p.m., Officer Esparza, along with Officers Rendon and Soraghan, and two Cicero detectives, went to 4839 W. 24th Street, Cicero, Illinois, looking for defendant. As the officers were walking up to the house, they saw defendant coming out of the building. Officer Soraghan called out defendant's name and defendant turned away and went toward the gangway. After Officer Soraghan called defendant's name again, defendant stopped, and the

officers placed him under arrest. When they arrested defendant, he was carrying a bag that contained clothing, toiletries, a toothbrush and toothpaste. Defendant was taken to Area Four, where he was placed in a lineup and identified by Felipe and Alice Alvarez.

During his testimony Officer Soraghan indicated that he was familiar with defendant, knew him to be a member of the Satan Disciples street gang and knew him to live at 2444 S. Springfield on the night Sonny had been shot. He also testified that he knew another member of the Satan Disciples, Peter Burnell, lived in an apartment at 4019 West 24th Street.

Chicago police officer Robert Fitzgerald testified that in the very early morning hours of January 2, 1991, just after midnight, he learned that defendant had been arrested for the homicide of Sonny Medina which had occurred the night before. He also testified that later that morning he was informed of the Salgado armed robbery. Officer Fitzgerald stated that he was given the physical description of the offender in the Salgado robbery and told that a revolver, the same type of gun used to kill Sonny Medina, was used by the offender in the Salgado robbery. Officer Fitzgerald also learned that the armed robbery occurred 40 minutes after the homicide. After receiving this information, Officer Fitzgerald picked up Ramon Salgado and took him to Area Four Violent Crimes. At Area Four, Ramon Salgado identified defendant's picture from a group of six. After identifying defendant's photograph, Officer Fitzgerald took Ramon to where defendant had been arrested to look for the stolen car. The car was recovered at 4843 W. Cermak, two blocks from where defendant was arrested.

Dr. Edmond Donoghue, Jr., deputy chief medical examiner with the Cook County medical examiner's office, testified that he conducted an exam on Sonny. It was his opinion that Sonny died of a gunshot wound to the back.

It was stipulated between the parties that if called, Dr. Bynes, a surgeon at Rush-Presbyterian Hospital, would testify that on January 2, 1991, he performed surgery on Jaime Tejeda and recovered a bullet from his abdomen. Dr. Bynes gave the bullet to Ms. Mary Muse, who worked for the pathology department of the hospital. Ms. Muse kept custody and control of the bullet and on January 10, 1991, gave the bullet to Chicago police officer Caputto, who inventoried the bullet. Richard Fournier, a firearms examiner with the Chicago police department crime lab, would testify that he examined two bullets in this case, one recovered from Sonny's body and one recovered from Jaime Tejeda's body. He would further testify that both bullets were of .38-caliber ammunition. Neither bullet was suitable for comparison.

Clinton Elmore, an in-take paramedic at Cermak Hospital, testified that on January 2, 1991, he performed a physical exam on defendant. Defendant had a bruise under each eye. Mr. Elmore did not observe any injuries to the back of defendant's head. He did not see any swelling, abrasions, scratches or bruises on defendant's body. Defendant did not complain of any injuries to the abdomen, ribs, legs or arms.

Rebecca Hernandez, a friend of defendant, testified that in the early morning hours of January 1, 1991, she was arguing with her boyfriend, Paul Hernandez, in the middle of 25th and Springfield. They had been arguing for 15 to 20 minutes when they heard a commotion. She testified that Paul told her to go in the gangway and wait. Rebecca waited in the gangway for 10 minutes and then looked out towards the street. When she looked out she saw three or four men dragging and kicking Paul down the street. She went back in the gangway and walked to the end of the building to see if there was a way that she could leave through the alley. She did not see anybody or anything in the alley. She then heard three or four gunshots. Five minutes later, after it got quiet, she went to the defendant's house and found Paul Hernandez in defendant's kitchen. He had been shot in the shin and his face and clothes were bloody.

Jerome Mendoza testified that he was at defendant's house for a New Year's Eve party on January 1, 1991. He testified that he was the only male guest at the party that was not a member of the Satan Disciple Gang. He testified that defendant, Albert Quiroz, Chris Mendoza, Mike Murro and Paul Hernandez were all Satan Disciples. He testified that about 3 a.m. defendant's brother, Albert Quiroz, looked out the window and saw four men beating up defendant. Mendoza and the other guests ran outside to help defendant and joined in the fight. While they were fighting, people were screaming out "King Love." He stated that the Latin Kings are another gang. After the fight was over, defendant and his guests went back to his house. Once inside, they noticed that Paul Hernandez was missing, so they all went back outside. While outside someone came out of the gangway near defendant's house and started shooting. Jerome's brother Christopher was shot in the mouth and the knee and was later taken to Mt. Sinai Hospital.

Defendant testified that he was a member of the street gang, the Satan Disciples. He testified that he gave a New Year's Eve party on December 31, 1990, and sometime after 2 a.m. on January 1, 1991, he left his house with his ex-girlfriend, Angie. While outside, four people jumped out of a car and came toward defendant shouting "King Love." Angie ran back to defendant's house. Defendant testified that

he also tried to run back to his house but the Latin Kings caught him and proceeded to beat him up. He testified that they were kicking and punching him in the face, ribs, and legs. He stated that they beat him in the face until it bled. Defendant testified that his friends and other Latin Kings came out and joined in the fight. He indicated that he broke away and ran to his gangway. Defendant testified that while in the gangway, he saw somebody with a gun and he took that gun.

Defendant testified that he was very mad, so he went and shot at the Latin Kings. After emptying his gun, defendant ran into his house and then to the gangway behind his house. He indicated that he threw the gun, but he doesn't remember where he threw it. Defendant testified that he went into the alley, his friend Eduardo Hernandez pulled up and he jumped inside Eduardo Hernandez's car who drove him to his friend Nancy's house at 4839 W. 24th Street, Cicero, Illinois. Later that day, the police arrested defendant at Nancy's house. Defendant admitted to shooting Sonny because he thought Sonny was one of the guys who had beat him up.

Eduardo Hernandez, a friend of defendant and a Satan Disciple, testified that he was at defendant's house on January 1, 1991. He testified that at approximately 2 a.m. he left with several other Satan Disciples to drive around the neighborhood. After they drove around the neighborhood, they returned to defendant's house. They drove down the alley behind defendant's house. Eduardo testified that as they were driving down the alley, they saw defendant standing in the alley behind his garage. Eduardo testified that defendant jumped in his car and he drove defendant to his friend Nancy's house at 24th and Cicero. Eduardo Hernandez testified that the reason he drove defendant to Nancy's house was because it was the only place he could think to go.

Chicago police officer James Ryan testified that he interviewed Jaime Tejeda while he was being treated by doctors in the emergency room. When the police asked Jaime if he knew who shot him, he responded negatively.

During closing arguments, the prosecutor argued that Sonny Medina had been a peacemaker who had tried to break up a fight between the Latin Kings and the Satan Disciples and, in the process, angered the defendant. Defendant then returned to his house at 2444 S. Springfield, got a gun, and shot Sonny and Jaime Tejeda. The prosecutor also argued that following the shooting, defendant ran to Peter Burrell's home at Pulaski and 24th Street to avoid arrest, but was unable to wake Burrell to let him in. Finally, the prosecution argued that defendant, without anywhere else to go, was forced to steal Ramon Salgado's car at gunpoint and drive to Nancy's house.

Defendant's attorney did not contest the fact that defendant shot and killed Sonny and wounded Jaime, but argued instead that defendant should be convicted of the lesser offense of second degree murder due to the fact that defendant shot during a moment of sudden and intense passion. He also argued that Ramon Salgado's identification of the defendant's photograph was suggestive and that Ramon was mistaken in his identification of defendant. He urged the jurors to believe the version of events offered by defendant and Eddie Hernandez.

Following deliberations, the jury convicted defendant of first degree murder for killing Sonny, aggravated battery for the shooting of Jaime Tejeda and for the armed robbery of Ramon Salgado.

Defendant first argues that the evidence presented at trial failed to prove he committed the offense of armed robbery. The relevant inquiry when addressing such a claim is whether any rational trier of fact could have found the essential elements of the crime. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) The testimony of one witness, if credible and positive, is sufficient to convict, even if contradicted by the accused. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819.) It is not the duty or the privilege of a reviewing court to substitute its judgment for that of the trier of fact, who has the ability to observe the demeanor of the witness. *People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.

A person commits armed robbery when he takes property from the person or presence of another by use of force or by threatening the imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a).) In this case, Ramon Salgado identified defendant in court as the man who pointed a revolver at him and stole his brother's car. The State presented testimony that this robbery occurred just 40 minutes after defendant shot and killed Sonny Medina and wounded Jaime Tejeda with a revolver, and within walking distance from the scene of the shooting. The State also presented evidence that the robbery occurred very near the place where another member of defendant's gang lived. Ramon Salgado testified that defendant was throwing rocks or snow at a second-floor window at this location. Finally, testimony indicated that the stolen car was recovered within two blocks from the place where defendant was arrested.

■ Defendant's challenge must be rejected under these facts as there is sufficient evidence to affirm his armed robbery conviction. Defendant argues that Ramon Salgado's identification of defendant was insufficient because Salgado did not have adequate opportunity to make a reliable identification. The test of positive identification,

however, is whether the witness had an opportunity to view the offender for a sufficient length of time under conditions adequate for observation—conditions need not be perfect and the observation does not need to be prolonged. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) Moreover, the question of the reliability of testimony is a question of fact for the jury. *People v. Jackson* (1977), 69 Ill. 2d 252, 261, 371 N.E.2d 602.

Defendant complains that the admission of testimony from Officer Soraghan that a Satan Disciple named Peter Burnell lived at the same location as where Ramon identified defendant had no probative value and was, therefore, irrelevant. Defendant also argues that the admission of this testimony unfairly prejudiced his case. Testimony that a member of defendant's gang lived at 24th and Pulaski has the tendency, however, to make it more likely that defendant was in this area during the time period immediately following the shooting. It is therefore relevant. (See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864 (discussing relevancy).) Moreover, it is difficult to see what improper prejudicial effect this testimony may have had on the minds of the jurors as defendant readily conceded his membership in the Satan Disciples street gang. We find defendant's general argument that this testimony "unduly influenced" the jury and improperly "excited a suspicion of guilt" to be unpersuasive.

Defendant next argues that the trial court improperly allowed the prosecutor to inflame the jury when his objections to the following argument were overruled:

"MS. DEMACOPOULOS [prosecutor]: The first thing you should do is go through those jury instructions because he is telling you it is either first degree murder or second degree murder. Now, ladies and gentlemen, it's a little ironic that a disciple of Satan would come into this courtroom—

MR. SARLEY [defendant's attorney]: Objection, Your Honor.

THE COURT: Overruled.

MS. DEMACOPOULOS: —and tell you or ask you to find him guilty of second degree murder and not first degree murder because he was acting out of passion. The word '[P]assion,' ladies and gentlemen, comes from the word of the suffering of Christ between the Last Supper and the following day. Disciple of Satan wants to hide from that.

MR. SARLEY: Objection.

THE COURT: Overruled."

Specifically, defendant argues that the prosecutor's reference to defendant as a "disciple of Satan," requires reversal of his convictions.

In general, a prosecutor is given wide latitude in choosing his or her closing and rebuttal arguments and the only requirement is that

the argument be based upon the evidence or be a reasonable inference drawn therefrom. (*People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596.) A prosecutor may denounce the accused, reflect upon his credibility or the credibility of other witnesses, as well as "urge the fearless administration of justice if based upon facts in the record." (*People v. Thomas* (1988), 172 Ill. App. 3d 172, 178-79, 526 N.E.2d 467.) It is improper, however, for a prosecutor to engage in inflammatory arguments designed solely to arouse the passions of the jury. *People v. Johnson* (1987), 119 Ill. 2d 119, 139, 518 N.E.2d 100; *People v. Bryant* (1983), 94 Ill. 2d 514, 523, 447 N.E.2d 301.

■ Recently, in *People v. Cruz* (1993), 248 Ill. App. 3d 473, we considered sarcastic references by the prosecutor to a fictional crucifix and Bible and noted that sarcastic comments designed to stir religious feeling push beyond the bounds of proper courtroom decorum. (*Cruz*, 248 Ill. App. 3d at 479.) We believe that the comments made by the prosecutor in this case were every bit as improper as the remarks made by the prosecutor in *Cruz*, particularly the prosecutor's comments regarding the Passion of Christ. Instead of drawing upon the evidence presented at trial, the prosecutor denounced the defendant by drawing upon religious imagery with no relevance to the facts of the case. Moreover, it is obvious that the fact that defendant admitted belonging to the Satan Disciples street gang does not lead to the reasonable inference, as the State argues, that defendant was a "disciple of Satan." References by the prosecutor to defendant being a "disciple of Satan" were clearly improper.

Nonetheless, improper remarks do not constitute reversible error unless there is substantial prejudice to the accused. (*Johnson*, 119 Ill. 2d at 139-40.) Substantial prejudice means the verdict would have been different absent the complained-of remark. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) Moreover, the jury in this case was specifically instructed that closing arguments are not evidence and that statements made during arguments not based upon the evidence should be disregarded. Such instructions are deemed to protect defendant against most prejudices caused by a prosecution's improper comments. (*People v. Jackson* (1990), 195 Ill. App. 3d 104, 551 N.E.2d 1025; *People v. Perez* (1983), 113 Ill. App. 3d 143, 446 N.E.2d 1229.) Because our review of the record leads to the conclusion that the quoted remarks did not unfairly influence the outcome of defendant's case, we conclude the prosecutor's remarks amounted to harmless error. See *Cruz*, 248 Ill. App. 3d at 479.

Defendant's third contention is that the trial court erred in refusing to sever the charges against him into two separate trials. Prior to trial, defendant's attorney brought a motion to sever those counts of

his indictment which related to the shootings of Sonny Medina and Jaime Tejeda from those counts which related to the armed robbery of Ramon Salgado. The trial court denied this motion. Defendant argues that the trial court's decision to join all counts constituted reversible error.

The joinder of offenses at trial is governed by sections 111—4 and 114—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, pars. 111—4(a), 114—7). (*People v. York* (1975), 29 Ill. App. 3d 113, 117, 329 N.E.2d 845.) The general test of the appropriateness of joinder is whether the offenses were of a similar nature or were part of a single transaction or common scheme. (*People v. Harmon* (1990), 194 Ill. App. 3d 135, 139, 550 N.E.2d 1140; *People v. Bean* (1978), 63 Ill. App. 3d 264, 279, 379 N.E.2d 723.) The most important factors in deciding whether offenses are part of a comprehensive transaction is whether they are proximate in time and location and whether there is an identity of evidence between the offenses. *Harmon*, 194 Ill. App. 3d at 139-40; *People v. Reynolds* (1983), 116 Ill. App. 3d 328, 335, 451 N.E.2d 1003.

■ In this case, the shootings occurred on the 2400 block of South Springfield, while the armed robbery occurred at 24th and Pulaski. These locations are within two blocks from one another and defendant's counsel conceded at the motion to sever that "there is no question there is proximity of time and location in this case."

With regard to the "identity of evidence," the State presented testimony tending to show that within an hour of shooting his victims and prior to stealing Ramon Salgado's car, defendant unsuccessfully attempted to gain entrance into the home of a fellow gang member in an apparent attempt to flee the scene of the shooting. Salgado's testimony indicated that defendant used a gun consistent with the murder weapon to steal Salgado's car and the stolen car was found within two blocks of where defendant was ultimately arrested. We conclude that, under these facts, the trial court was within its discretion in allowing the State to try the case upon the theory that the armed robbery of Ramon Salgado was a direct outgrowth of defendant's need to flee the scene of the shooting and was therefore part of a "single transaction" or "common scheme." *Cf. Reynolds*, 116 Ill. App. 3d at 335 (trial court properly joined offenses where evidence indicated that second offense was outgrowth of defendant's flight from first crime scene).

■ Finally, defendant makes various challenges to the constitutionality of the Illinois murder statute. Each of these arguments has been fully addressed and rejected by prior appellate decisions, however, and we decline to review the substance of these decisions

here. (See *People v. Carter* (1993), 245 Ill. App. 3d 7, 17, 614 N.E.2d 167 (and cases cited therein).) Defendant's arguments are rejected.

For the foregoing reasons, the judgement of the trial court is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.