NOTICE

Decision filed 12/16/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160524-U

NO. 5-16-0524

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 13-CF-2155 |
| | ) | |
| TAVON LUDY, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justice Wharton concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held*: The trial court abused its discretion in joining the aggravated battery of a child case with a murder case involving the victim's brother where the two charges were not part of the same comprehensive transaction and the joinder resulted in undue prejudice.

¶ 2    The defendant, Tavon Ludy, was charged with aggravated battery of a child. He was also charged separately with first degree murder. Both charges stemmed from the defendant's discipline of his fiancée's two young sons. The State filed a motion for joinder of the two charges, which the trial court granted. Here, the defendant appeals his conviction for aggravated battery of a child, arguing that (1) there was insufficient evidence to prove

1

beyond a reasonable doubt that he caused bodily harm, an essential element of the offense, and (2) the trial court abused its discretion in granting the State's motion for joinder because the incidents involved in the two charges were not part of the same comprehensive transaction. The subject of this appeal is the defendant's conviction for aggravated battery of a child. His conviction for first degree murder is the subject of *People v. Ludy*, No. 5-16-0523. For the reasons that follow, we reverse the defendant's conviction for aggravated battery and remand for a new trial on that charge alone.

¶ 3                                    I. BACKGROUND

¶ 4     At the time of the offense, the defendant was residing with his fiancée, Toria C., and her two sons, seven-year-old Z.F. and five-year-old T.W. The defendant and Toria had agreed that the defendant would be responsible for disciplining the two boys. His discipline methods included spanking the boys with a belt and punching them in the chest.

¶ 5     On the morning of September 29, 2013, the defendant noticed that trash was strewn about the backyard. He told both boys to pick up the trash; however, only Z.F. complied. The defendant told T.W. to go help his brother. When T.W. refused, the defendant punched him in the chest one time. T.W. collapsed. The defendant attempted to revive him. He also attempted to reach Toria on her cell phone, but she did not answer. Ten minutes later, the defendant called 9-1-1. He performed cardiopulmonary resuscitation (CPR) pursuant to instructions from the 9-1-1 dispatcher, but T.W. did not survive.

¶ 6     The defendant agreed to go to the police station to be interviewed later that day. Among other things, the defendant told police that during the previous evening, he had disciplined both Z.F. and T.W. by spanking them with a belt and punching them in the

chest. Later that night, a head-to-toe medical examination of Z.F. revealed the presence of numerous linear bruises on Z.F.'s legs and buttocks.

¶ 7    The defendant was subsequently charged with one count of aggravated battery of a child. The charge alleged that the defendant struck Z.F. about his body with his fist between February 1 and September 29, 2013. The defendant was also charged separately with first degree murder of T.W.

¶ 8    Prior to trial, the State filed a motion to join the two cases. At an August 2016 motion hearing, the State informed the trial court that the evidence was expected to show that the defendant regularly punched both Z.F. and T.W. in the chest as a means of discipline and that he used this method of discipline on both boys on the morning that T.W. died. The State argued that the two charges should be joined because the two incidents were factually similar and occurred only hours apart. The State further argued that because both cases involved allegations of domestic violence, evidence of the defendant's abuse of Z.F. would be admissible in the murder trial pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2014)). As such, the State argued, the defendant would not be prejudiced by joinder of the two cases.

¶ 9    In response, the defendant argued that joinder would be improper due to the "broad allegations" in the aggravated battery case, noting that the charge alleged that the defendant "committed some battery during a broad period of time." The defendant further argued that joinder would be highly prejudicial because evidence in the battery case would make it look like he "routinely beat" both children "when, in fact, even on the autopsy on [T.W.]

3

there are no signs of abuse, there are no bruises, no marks." We note that neither party addressed the potential for prejudice in the aggravated battery of a child case.

¶ 10   The trial court denied the State's motion, noting that the two cases would involve some of the same evidence but that the offenses charged involved different elements. Additionally, the aggravated battery case covered a span of eight months. However, it remarked that, "Based on what's been argued to me in court today, it would appear that the act that the State's really wanting to pursue is the alleged act that occurred on September 29." The prosecutor responded, "Correct."

¶ 11   After the hearing, the State filed an amended charge, alleging that the defendant struck Z.F. in the chest on or about September 29, 2013. The State filed a motion to reconsider the joinder motion, which the trial court granted on the basis that both charges now related to a single similar incident.

¶ 12   At trial, Toria testified that she and the defendant moved in together in November 2012. In January 2013, the defendant offered to take on the responsibility of disciplining the children. Toria explained that the defendant thought that she was too lenient with them, and he believed that being the disciplinarian was his role because he was "the man of the house." She agreed to allow the defendant to take on that role.

¶ 13   Toria testified that the defendant's disciplinary methods varied depending on what the child did wrong. Some of his methods included making them run up and down the hill in the backyard, doing push-ups in the basement, and giving them "a whoop" with a belt. She never saw any marks on the boys resulting from spankings. She never saw the

4

defendant punch either of the boys in the chest. However, she acknowledged that she was not usually present when the boys were disciplined.

¶ 14 Toria testified that on September 28, 2013, the night before T.W.'s death, both of the boys got into trouble for eating junk food without permission. She testified that they both "had gotten a whoop" with a belt. The following morning, she observed a bruise on Z.F.'s thigh, which she described as "not that big."

¶ 15 That following morning, she left the boys in the care of the defendant while she went shopping for supplies for T.W.'s birthday celebration later that day. She did not have her cell phone with her because she was unable to find it before she left the house. When she returned home from shopping, she saw caution tape. She was advised to go to Anderson Hospital where she learned that T.W. had died.

¶ 16 Toria acknowledged that she had been charged with child endangerment and was testifying in exchange for a reduced misdemeanor charge and a sentence of two years' probation. Her criminal case remained pending and would not be resolved until after the defendant's trial.

¶ 17 On cross-examination, Toria testified that the defendant loved her sons, and they loved him. The defendant cooked for the boys, helped Z.F. with his homework, and taught T.W. how to ride a bicycle. When she saw the defendant discipline the boys, his discipline was within an acceptable range.

¶ 18 In a video-recorded interview, the defendant described the events of September 29, 2013, to two detectives. He stated that he went outside and saw that trash had been scattered around the yard, noting that a racoon may have gotten into the trash. The defendant told

5

the boys to clean up the trash in the yard. Z.F. did so, but T.W. stayed in the house eating his breakfast. He told T.W. to go outside and help his brother, but T.W. refused. He then punched T.W. in the chest.

¶ 19    The defendant told the detectives that T.W. was sitting on a stool in the kitchen when he struck him. T.W. then got up from the stool crying. He took a few steps and fell forward, striking the right side of his head against the refrigerator before landing on his stomach.

¶ 20    T.W. was still breathing, but it was labored. The defendant picked up T.W. and carried him to his bedroom. He placed T.W. on his bed and tried to revive him by splashing water on his face and offering him water to drink; however, this did not work. The defendant then carried T.W. to the basement. He explained that he did not want Z.F. to see his brother because he did not want to scare him. Because he was not T.W.'s guardian, he first tried to contact Toria, but she did not respond to his calls or texts. However, when he was unable to reach Toria, he called 9-1-1. The dispatcher who answered his call gave him directions on how to begin CPR, and the defendant followed those directions.

¶ 21    In describing his usual methods of discipline, the defendant explained that he took over discipline of the boys because they "would never listen to their mother." He used several different methods of discipline, including requiring the boys to do push-ups or sit in the corner holding up their arms. Punching them in the chest was a common method of discipline because it was the most effective method.

¶ 22    The defendant noted that both boys were "really in trouble" the day before T.W.'s death. Z.F. got into trouble for sneaking food into his bed, and T.W. got into trouble for

6

wetting his bed. The defendant spanked both boys on their buttocks with a belt, punched each of them one time in the chest, and told them that he wanted them to think about what they had done.

¶ 23 The defendant stated that neither child ever had physical injuries after being disciplined in the past. He was asked twice if he used more force than usual when he punched T.W. in the chest that morning. Both times, the defendant answered, "No."

¶ 24 Lieutenant Carole Presson in charge of the Juvenile Division of the Madison County Sheriff's Department's Investigative Division testified as follows. She interviewed Z.F. on the day of the incident at the home of a neighbor. The interview was audio recorded.

¶ 25 In the recorded interview, Lieutenant Presson began by telling Z.F. that there were three rules: first, he must tell her the truth. Second, if he does not know the answer to a question, he should say, "I don't know." Third, he should correct her if she says something that is not correct. Next, they spoke about school and his family for approximately five minutes. Lieutenant Presson then asked, "Can you tell me what you did today?" Z.F. told her that he was taking out the trash. He then said, "And he's trying to get some food out of the refrigerator and [the defendant] punched him in the chest, I think, I don't know."

¶ 26 Z.F. told Lieutenant Presson that while he was outside taking out the trash, T.W. was eating breakfast. When he went back inside, the defendant was in the basement with T.W. The defendant told Z.F. to go to his room and said, " 'I punched T.W. in his chest and he fall asleep.' " According to Z.F., the defendant was in the basement when he punched T.W. The defendant did not tell Z.F. why he punched T.W.

7

¶ 27   When asked if the defendant ever hit him, Z.F. initially answered, "No." He then told Lieutenant Presson that when he and T.W. did things they were not supposed to do, the defendant would punch them in the chest and send them to bed. He told her that they also got "spankings and a lot of things" when they got in trouble. Lieutenant Presson asked, "What kind of things?" Z.F. replied, "Whoopins." He then told her that if they did something "really, really bad," the defendant would punch them in the chest.

¶ 28   Z.F. also testified in person that he was 7 years old when the incident occurred, and he was 10 years old when the matter came to trial. When asked what happened to his brother, Z.F. testified, "What happened was that we were eating breakfast and [the defendant] told me to take out the trash, and I did. I came back and I was scared. I saw that [T.W.] passed out, that he was on the ground. [The defendant] told me to go in my room." When he went outside to take out the trash, he saw T.W. attempting to get a glass of water, which he was not supposed to do. When he came back inside, he saw that "[the defendant] punched [T.W.] in his face all the way to the refrigerator door."

¶ 29   Z.F. was asked about discipline in the home. He stated, "Most of the time I would be standing on the wall or [the defendant] would whoop me." He explained that when the defendant hit him, he used a belt, which hurt. Sometimes he was also sent to his room or punched.

¶ 30   Dr. Raj Nanduri, the pathologist who performed an autopsy on T.W., testified that she determined the cause of T.W.'s death was a rare condition called commotio cordis, which can occur if a child's chest wall is not fully formed. She explained that when force is applied to the left ventricle area of the child's heart during a particular 15-millisecond

8

period of the cardiac cycle, it causes the child's heart to stop. The force necessary to cause commotio cordis is between 20 and 50 miles per hour.

¶ 31    Much of Dr. Nanduri's testimony is not germane to this appeal. It is worth noting, however, that three autopsy photographs were entered into evidence and shown to the jury. Two of those photographs showed a small bruise on T.W.'s chest from the interior of the skin on his chest wall. The third photograph showed a portion of T.W.'s brain, where Dr. Nanduri did not observe any injury.

¶ 32    Dr. Christopher Wangard, the director of pediatrics at Cardinal Glennon Hospital, examined and treated Z.F. at the emergency room on the evening T.W. died. He testified that he performed a head-to-toe examination on Z.F., during which he observed multiple bruises on Z.F.'s legs and buttocks, as well as "a couple of other scattered bruises elsewhere." He testified that Z.F. "had really too many bruises to count—at least dozens."

¶ 33    Dr. Wangard noted that Z.F. had both linear bruises and round bruises. He opined that the linear bruises were likely the result of child abuse. He reached this conclusion based on both the number and patterns of the bruises. He explained that linear bruises are consistent with child abuse because they indicate that the child was struck by an object with a straight edge, such as a belt or strap.

¶ 34    Finally, Dr. Wangard testified that the bruises he observed were in different stages of healing. This indicated that they had been inflicted at different times. On cross-examination, Dr. Wangard acknowledged that his examination of Z.F.'s chest was unremarkable.

9

¶ 35　The jury found the defendant guilty on both charges. The trial court subsequently sentenced the defendant to concurrent prison terms of 30 years for first degree murder and 3 years for aggravated battery of a child. This appeal followed.

¶ 36　　　　　　　　　　　　　II. ANALYSIS

¶ 37　The defendant argues that the trial court abused its discretion in granting the State's joinder motion. He argues that (1) the two charges were not part of the same comprehensive transaction, and (2) he was unfairly prejudiced in this case because the jury heard the evidence in the murder case. We agree.

¶ 38　A trial court may order the joinder of separate charges if the offenses charged "could have been joined in a single charge." 725 ILCS 5/114-7 (West 2014). Joinder of multiple charges is permissible only if the offenses are "based on the same act" or are based on multiple acts that form "part of the same comprehensive transaction." *Id*. § 111-4(a). However, joinder of separate charges is not appropriate if it appears that defendant will be unfairly prejudiced as a result. *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 45. The court has substantial discretion in deciding whether to join or sever charges. We will not disturb the court's decision absent an abuse of that discretion. *Id*. ¶ 46. In addition, even if we find that joinder of the charges was not appropriate, we will not reverse unless the improper joinder was prejudicial to defendant. *People v. Walston*, 386 Ill. App. 3d 598, 609 (2008).

¶ 39　Here, the charges were based on two separate acts—a punch in the chest to Z.F. on September 28, 2013, and a punch in the chest to T.W. the following day, September 29,

2013. The question, then, is whether these acts were part of the same comprehensive transaction.

¶ 40    There are no precise criteria to definitively answer this question. *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990) (citing *People v. Duncan*, 115 Ill. 2d 429, 441 (1987)). However, courts generally consider the following four factors: (1) the proximity of the offenses in time and place, (2) the "identity of evidence" necessary to demonstrate a link between the offenses, (3) whether commission of the offenses involved a common method, and (4) whether the same or similar evidence would establish the elements of each offense. *Johnson*, 2013 IL App (2d) 110535, ¶ 47; *People v. Coulter*, 230 Ill. App. 3d 209, 216 (1992) (citing *Duncan*, 115 Ill. 2d at 441).

¶ 41    In *Walston*, the Second District provided useful guidance in the application of these four factors. 386 Ill. App. 3d 598. The court noted that the first factor—whether the offenses were close in time and place—is "probably the most helpful" of the four factors. *Id*. at 603; see also *People v. Quiroz*, 257 Ill. App. 3d 576, 586 (1993) (stating that proximity in time and place is one of the two "most important factors" in the joinder determination). This is because "as events become separated by time and distance, the likelihood decreases that they may be considered part of the same comprehensive transaction." *Walston*, 386 Ill. App. 3d at 603.

¶ 42    Here, the two charges against the defendant involved offenses that took place in the same home at different times and for different reasons. The defendant argues that although the offenses were "relatively close in time and location," they were two separate incidents involving two different individuals. Accordingly, he contends, they were not part of a

11

single comprehensive transaction. We agree. Although the two offenses were relatively close in time and place, our ultimate conclusion rests on consideration of all four joinder factors.

¶ 43    The second factor—the identity of evidence necessary to demonstrate a link between the offenses—"asks not whether evidence of the two crimes is similar or *identical* but rather whether the court can *identify* evidence linking the crimes." (Emphases in the original.) *Id*. at 605-06 (citing *Duncan*, 115 Ill. 2d at 442). In explaining the application of this factor, the *Walston* court relied heavily on the First District's decision in *Quiroz*. *Id*. at 606.

¶ 44    In *Quiroz*, the appellate court analyzed this factor where defendant was charged with first degree murder, aggravated battery, and armed robbery. 257 Ill. App. 3d at 577. The charges stemmed from a series of incidents that took place over the course of approximately one hour during the early morning hours on New Year's Day. *Id*. at 577-79. Defendant shot two individuals. *Id*. at 577-78. One died of his injuries, and the other was wounded. *Id*. at 583. Defendant admitted that he shot at members of a rival gang because he was angry about a fight that occurred a few hours earlier. *Id*. at 581-82. Evidence showed that, after the shootings, defendant "attempted to gain entrance into the home of a fellow gang member in an apparent attempt to flee the scene of the shooting[s]." *Id*. at 586. He then "used a gun consistent with the murder weapon" to steal a vehicle, which formed the basis of the armed robbery charge. *Id*. The State's theory was that the armed robbery of the vehicle owner "was a direct outgrowth of [defendant's] need to flee the scene." *Id*.

12

¶ 45    Prior to trial, defendant moved to sever charges related to the armed robbery from the other charges. The trial court denied this motion, and he was tried on all charges in a single trial. *Id*. at 577. On appeal, the First District discussed the "identity of evidence" factor, focusing on the evidence that defendant attempted to gain entry into a gang member's home before committing the armed robbery. *Id*. at 586. The appellate court concluded that the trial court properly exercised its discretion when it determined that the shootings and the armed robbery were part of a common criminal scheme. *Id*.

¶ 46    In *Walston*, the Second District agreed with the *Quiroz* court's application of the second factor—the identity of evidence. The *Walston* court explained that the evidence that defendant in *Quiroz* attempted to take refuge in the home of a fellow gang member "linked the armed robbery with the shootings and also helped establish that all three crimes were part of a common criminal scheme" because it showed that the armed robbery was part of defendant's attempt to flee. *Walston*, 386 Ill. App. 3d at 606 (citing *Quiroz*, 257 Ill. App. 3d at 586). The *Walston* court found no similar evidence linking the two sexual assault charges in the case before it "as components of a grander criminal scheme" despite similarities between the two offenses. *Id*. at 608-09.

¶ 47    Here, there was evidence that each charge was based on the defendant's similar disciplinary practices on each child. As such, the offenses were not wholly unrelated as were the offenses involved in *Walston*. However, there was no evidence showing that the two incidents were part of a "grander criminal scheme" in the way the offenses involved in *Quiroz* were. Instead, the defendant disciplined Z.F. on the evening of September 28, 2013, for sneaking junk food into his bed, and he disciplined T.W. for an unrelated incident

13

the following morning—refusing to pick up the trash in the yard. In short, we cannot identify any evidence linking the two offenses as part of a larger criminal endeavor.

¶ 48　As for the third factor—whether there was a common method or design in the offenses—the *Walston* court pointed out that there is some confusion over the meaning of the phrase "common method" within the context of this factor, as "the factor is more aptly characterized as asking whether the offenses were part of a 'common scheme.' " *Id*. at 606-07. Although the terms "common design" and "*modus operandi*" are often used interchangeably, they are quite different conceptually. *Id*. at 606. *Modus operandi* refers to a common method of committing crimes " 'so distinctive that separate crimes' " can be recognized " 'as the handiwork' " of the same individual, while a " 'common design refers to a larger criminal scheme of which the crime charged is only a portion.' " *Id*. (quoting *People v. Barbour*, 106 Ill. App. 3d 993, 999-1000 (1982)). The court emphasized that "the object of the joinder analysis is to determine whether two or more offenses are part of a single comprehensive transaction," and noted that the mere fact that multiple crimes are committed in the same manner does not resolve this question. *Id*.

¶ 49　Here, the two offenses were committed in a similar manner. However, there is no indication that they were part of a common plan or design.

¶ 50　Finally, the fourth factor considers whether the same or similar evidence would be used to establish the elements of each offense. *Id*. at 607. This question should be considered only "if it is directed at the target of determining whether multiple offenses are part of a single comprehensive transaction." *Id*.

14

¶ 51 In the aggravated battery case at issue here, the State was required to prove that (1) the defendant knowingly caused bodily harm to Z.F. and (2) Z.F. was under the age of 13 years. 720 ILCS 5/12-3.05(b)(2) (West 2012). Alternatively, in the murder case, the State was required to prove that (1) the defendant's conduct caused T.W.'s death and (2) he acted with the knowledge that his conduct created a strong probability of death or great bodily harm. *Id*. § 9-1(a)(2).

¶ 52 Much of the same evidence was used to prove that the defendant committed the conduct at issue in each case. However, the evidence needed to prove the remainder of the elements of the two offenses was not identical or even similar. In the murder case, the State had to prove that the defendant's conduct caused T.W.'s death. Doing so required the State to present evidence of autopsy results. The State also had to present evidence from which the jury could infer that the defendant knew that his conduct created a strong probability of death or great bodily harm. Such evidence was not needed to prove that the defendant caused injury to Z.F. or that Z.F. was under the age of 13. Considering all four of these factors, we conclude that the two offenses were not part of the same comprehensive scheme or transaction.

¶ 53 We note that in some cases, courts have found joinder to be appropriate in cases involving allegations of ongoing abuse of two siblings that has followed a similar pattern. See, *e.g.*, *People v. Patterson*, 245 Ill. App. 3d 586, 588-89 (1993); *Trail*, 197 Ill. App. 3d at 746. In this case, however, it is not necessary for us to determine whether such cases can be reconciled with *Walston*. For the reasons set forth below, we reject the State's position

15

that here joinder was appropriate based on the similarities in how the defendant disciplined the brothers.

¶ 54    We find guidance from the Fourth District's decision in *Trail* and the Second District's decision in *People v. Willer*, 281 Ill. App. 3d 939 (1996). We note that both cases involved allegations of sexual abuse against pairs of siblings, while this case involves allegations of physical abuse against a pair of siblings. For purposes of joinder analysis, we do not find that distinction to be significant.

¶ 55    In *Trail*, defendant was charged with two counts of criminal sexual assault. The charges were based on the sexual abuse of his two teenage stepdaughters. *Trail*, 197 Ill. App. 3d at 744. Both stepdaughters testified that defendant repeatedly had vaginal intercourse with them. *Id*. at 744-45. The older stepdaughter was abused between late 1985 and January 1987. *Id*. at 744. The younger stepdaughter was abused in 1987 and 1988. *Id*. at 745. Prior to trial, defendant moved for severance of the two charges. The trial court denied that motion, finding that the two charges involved " 'a similarity of parties, setting, circumstances, and partially, the time frame involved.' " *Id*. at 746. The appellate court agreed, finding that the charges involved conduct that "occurred within the same household during closely related periods of time" and "involved similar victims." *Id*.

¶ 56    In *Willer*, the Second District reached the opposite conclusion. 281 Ill. App. 3d at 953. That case involved four charges alleging that defendant sexually abused his two minor daughters. *Id*. at 941-42. The first charge alleged that defendant regularly had vaginal intercourse with his daughter (M.W.) over a period of eight years. *Id*. at 953. The second charge alleged that defendant fondled M.W.'s buttocks, and the third charge alleged that

16

he engaged in oral sex with her. *Id*. at 941-42. These charges likewise involved multiple incidents of abuse. *Id*. at 952. The fourth charge, however, alleged one instance of abuse against defendant's other daughter, J.W. Specifically, the State alleged that he fondled her buttocks on one occasion. *Id*. at 953.

¶ 57 Prior to trial, defendant filed a motion to sever the charge alleging that he fondled J.W.'s buttocks from the three charges alleging conduct against M.W. *Id*. at 950. The trial court denied the motion, concluding that all of the charged acts of abuse were part of the same comprehensive transaction due to similarities among the charged offenses, *i.e.*, the victims were both defendant's daughters; all of the offenses took place in the girls' bedrooms; and the allegations "included similar acts of sexual abuse." *Id*.

¶ 58 The Second District reversed on appeal. *Id*. at 955-56. The court acknowledged that there were some similarities between the offenses charged. *Id*. at 953. Specifically, defendant assaulted both daughters in their bedrooms after giving them back rubs (*id*. at 952-53), and the assaults occurred during the same time period (*id*. at 951). However, the court found the connection between the charges to be "tenuous." *Id*. at 951. The court emphasized that defendant was charged with sexually assaulting M.W. "regularly and frequently" over a period of eight years, while he was charged with only one instance of abuse against J.W. *Id*.

¶ 59 Next, the court considered whether the same or similar evidence would be needed to prove the elements of all four charges. It found that though similar evidence would be needed to prove the essential elements of the charge alleging that defendant fondled M.W.'s buttocks and the charge alleging that he fondled J.W.'s buttocks, establishing the

17

elements of the other two charges involving abuse of M.W. would not require similar evidence to that needed to prove the charge involving J.W. *Id.* at 952.

¶ 60    Additionally, there were "marked differences" in how and for how long defendant perpetrated the offenses, again emphasizing the ongoing nature of the abuse of M.W. *Id.* The *Willer* court specifically distinguished the case from *Trail* on the basis that *Trail* involved allegations of ongoing abuse against both stepdaughters, while *Willer* involved ongoing abuse of one daughter and a single instance of abuse of the other daughter. *Id.* at 953. The court concluded that "the offenses pertaining to each daughter [were] distinct, with different victims and dates, and not part of the same comprehensive transaction." *Id.*

¶ 61    Here, we find *Willer* instructive to the case at bar. There was evidence that the defendant regularly used similar methods of discipline against both boys, including punching them in the chest. There was evidence of ongoing abuse of Z.F. resulting in numerous bruises; however, there was no evidence of any prior injury to T.W. Moreover, as we have already discussed, the elements of the two offenses shared no common elements, and much of the evidence needed to prove the murder charge was different from the evidence needed to prove the aggravated battery charge. Like the *Willer* court, we find that the two charges in this case were "distinct, with different victims and dates." See *id.* We therefore conclude that they were not part of the same comprehensive transaction.

¶ 62    Next, we must consider whether improper joinder resulted in undue prejudice. *Walston*, 386 Ill. App. 3d at 609. We conclude that it did.

¶ 63    We first note that because both cases involved allegations of domestic violence, some evidence concerning abuse of each brother would be admissible in a separate trial

18

involving the abuse of the other brother. See 725 ILCS 5/115-7.4(a) (West 2014). In addition, some evidence concerning the murder investigation may have been admissible to explain the course of the police investigation that led to the charge in the aggravated battery case. See *People v. Gonzalez*, 379 Ill. App. 3d 941, 950 (2008). Where other-crimes evidence is admissible in a separate trial, this fact often diminishes the prejudice that would otherwise arise from the improper joinder of unrelated offenses. See, *e.g.*, *Walston*, 386 Ill. App. 3d at 609; *Willer*, 281 Ill. App. 3d at 953; *Trail*, 197 Ill. App. 3d at 746. However, even where other-crimes evidence is generally admissible, it should be excluded if its probative value is outweighed by the risk of unfair prejudice. *People v. Nunley*, 271 Ill. App. 3d 427, 431 (1995). In addition, even if other-crimes evidence is admitted, the court must limit the details presented to that which is "necessary to illuminate the issue" the evidence is admitted to prove. *Id*. at 432.

¶ 64    Here, the murder evidence presented was highly prejudicial where the jury heard detailed evidence concerning the death of T.W. It also saw photographs from the autopsy, something it would not have seen in a separate trial on the charge of aggravated battery of a child alone. Moreover, murder is a more egregious crime than aggravated battery of a child, particularly in cases such as this one that do not involve allegations of serious bodily harm. In a separate trial, the jury would not have been exposed to such highly prejudicial evidence. See *id*. (finding that defendant was prejudiced by the admission of detailed evidence that he stabbed his mother and killed her dog and explaining that this evidence "subjected defendant to a mini-trial over conduct far more grotesque than that for which

19

he was on trial"). We therefore conclude that the trial court abused its discretion in granting joinder.

¶ 65                                    III. CONCLUSION

¶ 66    For the foregoing reasons, we reverse the defendant's conviction for aggravated battery of a child and remand for a separate trial on that sole charge.

¶ 67    Reversed; remanded for further proceedings.

¶ 68    JUSTICES CATES, specially concurring:

¶ 69    I agree that there was sufficient evidence to support the defendant's conviction for aggravated battery of a child. I do not agree that the trial court erred in allowing the State's motion for joinder of the offenses of murder and aggravated battery of a child, but concur in the decision to vacate the defendant's conviction, albeit for reasons different than those discussed in the majority's order. I write separately because I find that although the murder of T.W. and the aggravated battery to Z.F. were part of the same comprehensive transaction, the admission of the autopsy photographs at trial, without limiting instructions, unfairly prejudiced the defendant and requires a new trial.

¶ 70    The facts of this case have been thoroughly set forth in the majority's order and will only be repeated to the extent necessary. Preliminarily, it is important to recognize that the State originally charged the defendant with aggravated battery of a child that occurred between February 1, 2013, and September 29, 2013. In its motion for joinder, the State argued that it intended to use evidence of other offenses committed by the defendant. In a

20

criminal prosecution, where the defendant is accused of an act of domestic violence, or first degree murder, "evidence of the defendant's commission of another offense or offenses of domestic violence[1] is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2014).

¶ 71 The trial court initially denied the State's motion for joinder, indicating some concern that the dates alleged in the aggravated battery charge covered a span of time, rather than a specific date. The State then amended the charge, alleging that the defendant struck Z.F. in the chest, *on or about* September 29, 2013. Thereafter, the trial court granted the State's motion to reconsider and allowed the aggravated battery of a child and murder charges to proceed jointly before the same jury.

¶ 72 At trial, there was overwhelming evidence, even from the defendant, that he was the disciplinarian in the home. The boys' mother, Toria, testified that she allowed her two boys to be disciplined by the defendant, because he was the "man of the house." Toria knowingly allowed Z.F. and T.W. to be "whoop[ed]" with a belt, but claimed she never saw any marks on them as a result of the spankings. Toria's claim was rebutted by Dr. Wangard, who examined Z.F. Dr. Wangard testified that he found so many bruises, old and new, on the legs and buttocks of Z.F. that there were too many to count. Dr. Wangard also testified that he found linear bruises that would have been consistent with the belt the defendant described using on the boys. In addition, Dr. Nanduri testified that she found evidence of

---

[1]Here, the charge of aggravated battery of a child was an act of domestic violence, as defined in 750 ILCS 60/103(1), (3) (West 2014).

bruising on the buttocks and back of T.W., a fact that has gone unnoticed in the majority's order.

¶ 73 In a videotaped interview with detectives, the defendant admitted that he was the disciplinarian. The defendant explained that his methods of discipline varied. The defendant stated that sometimes he made the boys do push-ups, sit in the corner, or hold their arms in the air or out straight, and that sometimes he punched them in the chest, or used a belt on them. As noted by the majority, the defendant told the detectives that both boys were "really in trouble" the day before T.W.'s death. Z.F. got into trouble for sneaking food into his bed, and T.W. got into trouble for "peeing" in his bed. The defendant admitted that he spanked both boys on their buttocks with a belt, punched each of them one time in the chest, and told them that he wanted them to think about what they had done.

¶ 74 The defendant opined that punching a child in the chest was the "most effective" form of discipline for correcting behavior. At first, the defendant claimed he used an open hand. He later admitted that he punched the boys with his fist. Despite his admissions regarding "whoopins" with a belt and punches to the chest, the defendant claimed he did not see any marks on the children. As with Toria's testimony, the defendant's claim that he saw no markings on Z.F. is belied by the testimony from Dr. Wangard that there were too many bruises to count.

¶ 75 Based on the evidence that the defendant punched the children, ages seven and five, with his fist, the jury could reasonably find that he intended to inflict bodily harm on the children. The defendant terrorized two young children, while their mother stood by in apparent approval of the various forms of punishment. Based on the evidence, the jury

22

could reasonably conclude that the defendant intended to intimidate and exercise control over these young boys by inflicting both physical and emotional harm.

¶ 76   With regard to Z.F., although there was no testimony describing bruising on his chest, and Z.F. did not testify that the punches he received, or the welts on his leg, caused him harm, a reasonable person could infer from the testimony and other evidence at trial that the defendant intended to cause great bodily harm when he punched the child. The evidence is clear that on the evening before September 29, 2013, the defendant admitted punching Z.F. in the chest. This admission, alone, would have allowed the factfinder to determine that the defendant caused bodily harm to Z.F. *on or about* September 29, 2013. Thus, I conclude that the evidence introduced was overwhelming, beyond a reasonable doubt, to prove the defendant committed the act of aggravated battery of a child, as charged.

¶ 77   In light of the foregoing, and the additional facts discussed by my colleagues, I disagree with the majority's finding that the defendant's acts were not part of a common plan or design. I also disagree with the majority's determination that the trial court abused its discretion in joining the cases. I find that the defendant's acts of disciplining T.W. and Z.F. were offenses that were committed in a similar manner, and as part of a common method or plan. Further, the same or similar evidence was necessary to establish some of the elements of aggravated battery to Z.F., and some of the elements of the murder of his brother. And while the evidence of the defendant's disciplinary methods was critical in his own defense to each charge, this evidence also established a common methodology used by this defendant to discipline the children.

23

¶ 78   Therefore, I disagree with the majority's conclusion that the charges against the defendant were based on two distinct acts—a punch to the chest of Z.F., on or about September 29, and a punch to the chest of T.W., which resulted in his death. In reaching this conclusion, the majority has focused too narrowly on the separate acts, rather than viewing the evidence more globally with regard to what had been occurring in this household.

¶ 79   As noted earlier, section 115-7.4(a) of the Code of Criminal Procedure of 1963 (Code) specifically allows "evidence of the defendant's commission of another offense or offenses of domestic violence." 725 ILCS 5/115-7.4(a) (West 2014). The purpose of this section is to permit the factfinder to know what acts of domestic violence were taking place within this home. *Id.* The Illinois Supreme Court has considered this statute and found that its enactment was an effort by the legislature to abrogate the long-standing common law rule regarding the admissibility of "other-crimes evidence." See *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010).

¶ 80   In *Dabbs*, the defendant was charged with domestic violence and unlawful restraint of his girlfriend, DeWeese. *Id.* at 280. The girlfriend testified that she and the defendant came home from a video store, and that DeWeese went to bed, while the defendant stayed up drinking beer. DeWeese was later awakened by the defendant, who grabbed DeWeese out of her bed, dragged her by the hair into the bathroom, and pushed her head into the toilet, hitting her head on the rim of the bowl. Also, at trial, the defendant's ex-wife was allowed to testify that she was struck repeatedly with a belt, after the defendant got drunk. The defendant in *Dabbs* claimed that the admission of the ex-wife's testimony was

prejudicial, and that the statute was unconstitutional. In affirming the defendant's conviction, our supreme court found that section 115-7.4 was constitutional, that the evidence of other crimes of domestic violence was admissible, and that the defendant had not been unfairly prejudiced by the admission of the evidence. *Id.* at 295. The "other offenses" evidence in *Dabbs* is far more attenuated than the evidence presented in this case.

¶ 81 A defendant may be placed on trial in one proceeding for separate offenses if the offenses are "based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2014). There are no precise criteria to determine whether separate offenses are part of the same comprehensive transaction. *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990). Nevertheless, "a common method of operation, proximity in time and location of offenses, a common type of victim, similarity of offenses, and the identity of evidence needed to demonstrate a link between the offenses are some of the factors the courts have considered." *Id.* The trial court has broad discretion in determining whether charges may be joined, and the court's decision will not be reversed on review absent an abuse of that discretion. *Id.* A trial court abuses its discretion when its decision is "arbitrary, fanciful, or unreasonable," or where no reasonable person would take the trial court's view. (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 82 In this case, the evidence established that the defendant perpetrated multiple and continuous acts on two young and vulnerable boys who were not his own, but those of the defendant's fiancée. The defendant committed these horrific acts inside the children's home. Based on the amended charges filed by the State, the defendant's acts, resulting in

the murder of one child and the aggravated battery of the other, occurred in close proximity, and were inflicted for the same purpose—disciplining his fiancée's children. The defendant, himself, testified that he thought a punch in the chest was the "most effective" way of exacting obedience. The facts in this case clearly establish a criminal design of intimidation and exacting obedience through brutal force, whether it was by inflicting pain and welts from a belt, or using a punch to the chest, where there is very little fat to absorb the force of a 20- to 50-mile-per-hour blow.

¶ 83    The majority has concluded that "there was no evidence showing that the two incidents were part of a 'grander criminal scheme.' " *Supra* ¶ 47. Given the defendant's clear admissions to acts of domestic violence perpetrated against his fiancée's children, I cannot accept this conclusion. I find that the facts of this case are more akin to the facts in *Trail*, 197 Ill. App. 3d 742, than *People v. Willer*, 281 Ill. App. 3d 939 (1996). In this case, like *Trail*, the offenses involved similar victims and similar circumstances, and the offenses occurred within the same household during a closely related period of time. *Trail*, 197 Ill. App. 3d at 746.

¶ 84    Nevertheless, I agree that the defendant has established he was unfairly prejudiced in that some of the evidence that was relevant to the murder charge was not relevant to the aggravated battery charge. This evidence was in the form of the autopsy photographs. When presented with these particular photographs, depicting the inner skin of the chest wall and the skull, with the skin laid back, the average juror could have found them gruesome. There were no limiting instructions given to inform the jury that these photographs were relevant only to the murder charge. See, *e.g.*, *Illgen*, 145 Ill. 2d at 376

(trial court's limiting instruction on evidence of other assaults substantially reduced any prejudicial effect of that evidence). As such, I find that the admission of these photographs unfairly prejudiced the defendant, thus warranting a new trial on the charge of aggravated battery of a child. For the foregoing reasons, I specially concur.