NOTICE

Decision filed 02/05/21 The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 160523-U

NO. 5-16-0523

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 13-CF-2154 |
| | ) | |
| TAVON LUDY, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justice Wharton concurred in the judgment.
Justice Cates dissented.

**ORDER**

¶ 1    *Held*: The defendant's conviction for first degree murder is reduced to involuntary manslaughter where there was insufficient evidence to prove beyond a reasonable doubt that the defendant knew his act of punching the child in the chest created a strong probability of great bodily harm. We affirm the conviction as modified and remand with directions that a sentence be imposed for involuntary manslaughter.

¶ 2    The defendant, Tavon Ludy, was charged with first degree murder in the death of his fiancée's young son, T.W. He was also charged separately with aggravated battery of a child. Both charges stemmed from the defendant's discipline of his fiancée's two young sons. The State filed a motion for joinder of the two charges, which the trial court granted.

1

Here, the defendant appeals his conviction for first degree murder, arguing that (1) the evidence was insufficient to prove beyond a reasonable doubt that he knew that his conduct—punching T.W. a single time in the chest—created a strong probability of death or great bodily harm, (2) the court abused its discretion in joining the two cases because they were not part of the same comprehensive transaction, and (3) the court abused its discretion in admitting "gruesome and prejudicial" autopsy photographs. The defendant's conviction for aggravated battery of a child is addressed separately in *People v. Ludy*, 2020 IL App (5th) 160524-U. For the reasons that follow, we reduce the defendant's conviction to involuntary manslaughter, affirm as modified, and remand with directions for sentencing on involuntary manslaughter.

¶ 3                                I. BACKGROUND

¶ 4     On September 29, 2013, the defendant was residing with his fiancée, Toria C., and Toria's two sons, T.W. and Z.F. The defendant and Toria had previously agreed that the defendant would be responsible for the discipline of the two boys. His discipline methods included spanking the boys with a belt and punching them in the chest.

¶ 5     On the morning of September 29, 2013, the defendant noticed that trash was strewn about the backyard. He told both boys to pick up the trash; however, only Z.F. complied. The defendant told T.W. to go help his brother. When T.W. refused, the defendant punched him in the chest one time. T.W. collapsed. The defendant attempted to revive him. He also attempted to reach Toria on her cell phone, but she did not answer. Ten minutes later, the defendant called 9-1-1. He performed cardiopulmonary resuscitation (CPR) pursuant to instructions from the 9-1-1 dispatcher, but T.W. did not survive.

2

¶ 6    The defendant was charged with first degree murder for the death of T.W. See 720 ILCS 5/9-1(a)(2) (West 2014). He was also charged, in a separate case, with aggravated battery of a child. See *id*. § 12-3.05(b)(2). Prior to trial on either charge, the State filed a motion to join the two cases. At an August 2016 motion hearing, the State informed the trial court that the evidence was expected to show that the defendant regularly punched both Z.F. and T.W. in the chest as a means of discipline and that he used this method of discipline on both boys on the morning that T.W. died. The State argued that the two charges should be joined because the two incidents were factually similar and occurred only hours apart. The State further argued that because both cases involved allegations of domestic violence, evidence of the defendant's abuse of Z.F. would be admissible in the murder trial pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2014)). As such, the State argued, the defendant would not be prejudiced by joinder of the two cases.

¶ 7    In response, the defendant argued that joinder would be improper due to the "broad allegations" in the aggravated battery case, noting that the charge alleged that the defendant "committed some battery during a broad period of time." The defendant further argued that joinder would be highly prejudicial because evidence in the battery case would make it look like he "routinely beat" both children "when, in fact, even on the autopsy on [T.W.] there are no signs of abuse, there are no bruises, no marks." We note that neither party addressed the potential for prejudice in the aggravated battery of a child case.

¶ 8    The trial court denied the State's motion, noting that the two cases would involve some of the same evidence but that the offenses charged involved different elements.

3

Additionally, the aggravated battery case covered a span of eight months. However, it remarked that, "Based on what's been argued to me in court today, it would appear that the act that the State's really wanting to pursue is the alleged act that occurred on September 29." The prosecutor responded, "Correct."

¶ 9 After the hearing, the State filed an amended charge, alleging that the defendant struck Z.F. in the chest on or about September 29, 2013. The State filed a motion to reconsider the joinder motion, which the trial court granted on the basis that both charges now related to a single similar incident.

¶ 10 At trial, Toria testified that she and the defendant moved in together in November 2012. In January 2013, the defendant offered to take on the responsibility of disciplining the children. Toria explained that the defendant thought that she was too lenient with them, and he believed that being the disciplinarian was his role because he was "the man of the house." She agreed to allow the defendant to take on that role.

¶ 11 Toria testified that the defendant's disciplinary methods varied depending on what the child did wrong. Some of his methods included making them run up and down the hill in the backyard, doing push-ups in the basement, and giving them "a whoop" with a belt. She never saw any marks on the boys resulting from spankings. She never saw the defendant punch either of the boys in the chest. However, she acknowledged that she was not usually present when the boys were disciplined.

¶ 12 Toria testified that on September 28, 2013, the night before T.W.'s death, both of the boys got into trouble for eating junk food without permission. She testified that they

4

both "had gotten a whoop" with a belt. The following morning, she observed a bruise on Z.F.'s thigh, which she described as "not that big."

¶ 13    Toria testified that on the morning T.W. died, she left the two children in the care of the defendant while she went shopping for supplies for T.W.'s birthday celebration later that day. She did not have her cell phone with her because she was unable to find it before she left the house. When she returned home from shopping, she saw caution tape. She was advised to go to Anderson Hospital where she learned that T.W. had died.

¶ 14    Toria acknowledged that she had been charged with child endangerment and was testifying in exchange for a reduced misdemeanor charged and a sentence of two years' probation. Her criminal case remained pending and would not be resolved until after the defendant's trial.

¶ 15    On cross-examination, Toria testified that the defendant loved her sons, and they loved him. The defendant cooked for the boys, helped Z.F. with his homework, and taught T.W. how to ride a bicycle. When she saw the defendant discipline the boys, his discipline was within an acceptable range.

¶ 16    In a video-recorded interview, the defendant described the events of September 29, 2013, to two detectives. He stated that he went outside and saw that trash had been scattered around the yard, noting that a racoon may have gotten into the trash. The defendant told the boys to clean up the trash in the yard. Z.F. did so, but T.W. stayed in the house eating his breakfast. He told T.W. to go outside and help his brother, but T.W. refused. He then punched T.W. in the chest.

5

¶ 17 The defendant told the detectives that T.W. was sitting on a stool in the kitchen when he struck him. T.W. then got up from the stool crying. He took a few steps and fell forward, striking the right side of his head against the refrigerator before landing on his stomach.

¶ 18 T.W. was still breathing, but it was labored. The defendant picked up T.W. and carried him to his bedroom. He placed T.W. on his bed and tried to revive him by splashing water on his face and offering him water to drink; however, this did not work. The defendant then carried T.W. to the basement. He explained that he did not want Z.F. to see his brother because he did not want to scare him. Because he was not T.W.'s guardian, he first tried to contact Toria, but she did not respond to his calls or texts. However, when he was unable to reach Toria, he called 9-1-1. The dispatcher who answered his call gave him directions on how to begin CPR, and the defendant followed those directions.

¶ 19 In describing his usual methods of discipline, the defendant explained that he took over discipline of the boys because they "would never listen to their mother." He used several different methods of discipline, including requiring the boys to do push-ups or sit in the corner holding up their arms. Punching them in the chest was a common method of discipline because it was the most effective method.

¶ 20 The defendant noted that both boys were "really in trouble" the day before T.W.'s death. Z.F. got into trouble for sneaking food into his bed, and T.W. got into trouble for wetting his bed. The defendant spanked both boys on their buttocks with a belt, punched each of them one time in the chest, and told them that he wanted them to think about what they had done.

¶ 21    The defendant stated that neither child ever had physical injuries after being disciplined in the past. He was asked twice if he used more force than usual when he punched T.W. in the chest that morning. Both times, the defendant answered, "No."

¶ 22    Lieutenant Carole Presson in charge of the Juvenile Division of the Madison County Sheriff's Department's Investigative Division interviewed Z.F. on the day of the incident at the home of a neighbor. The interview was audio recorded. The recording was played for the jury. Lieutenant Presson began by telling Z.F. that there were three rules: first, he must tell her the truth. Second, if he does not know the answer to a question, he should say, "I don't know." Third, he should correct her if she says something that is not correct. Next, they spoke about school and his family for approximately five minutes. Lieutenant Presson then asked, "Can you tell me what you did today?" Z.F. told her that he was taking out the trash. He then said, "And he's trying to get some food out of the refrigerator and [the defendant] punched him in the chest, I think, I don't know."

¶ 23    Z.F. told Lieutenant Presson that while he was outside taking out the trash, T.W. was eating breakfast. When he went back inside, the defendant was in the basement with T.W. The defendant told Z.F. to go to his room and said, " 'I punched T.W. in his chest and he fall asleep.' " According to Z.F., the defendant was in the basement when he punched T.W. The defendant did not tell Z.F. why he punched T.W.

¶ 24    When asked if the defendant ever hit him, Z.F. initially answered, "No." He then told Lieutenant Presson that when he and T.W. did things they were not supposed to do, the defendant would punch them in the chest and send them to bed. He told her that they also got "spankings and a lot of things" when they got in trouble. Lieutenant Presson asked,

7

"What kind of things?" Z.F. replied, "Whoopins." He then told her that if they did something "really, really bad," the defendant would punch them in the chest.

¶ 25    Z.F. also testified in person that he was 7 years old when the incident occurred, and he was 10 years old when the matter came to trial. When asked what happened to his brother, Z.F. testified, "What happened was that we were eating breakfast and [the defendant] told me to take out the trash, and I did. I came back and I was scared. I saw that [T.W.] passed out, that he was on the ground. [The defendant] told me to go in my room." When he went outside to take out the trash, he saw T.W. attempting to get a glass of water, which he was not supposed to do. When he came back inside, he saw that "[the defendant] punched [T.W.] in his face all the way to the refrigerator door."

¶ 26    Z.F. was asked about discipline in the home. He stated that, "Most of the time I would be standing on the wall or [the defendant] would whoop me." He explained that when the defendant hit him, he used a belt, which hurt. Sometimes he was also sent to his room or punched.

¶ 27    Dr. Raj Nanduri, the pathologist who performed an autopsy on T.W., testified that she determined the cause of T.W.'s death was a rare condition called commotio cordis, which can occur if a child's chest wall is not fully formed. She explained that when force is applied to the left ventricle area of the child's heart during a particular 15-millisecond period of the cardiac cycle, it causes the child's heart to stop. The force necessary to cause commotio cordis is between 20 and 50 miles per hour.

¶ 28    Dr. Nanduri internally examined T.W. but did not observe anything significant. She explained, "His lungs, heart, chest, chest cavities, abdominal organs, cranium, and brain,

they all look normal to me." Dr. Nanduri was specifically asked if she observed any internal injuries that lined up with the bruise on T.W.'s chest. She replied, "No, there wasn't any fractures, there wasn't any muscle hemorrhage, nothing."

¶ 29    Dr. Nanduri was asked about People's Exhibits 94 and 95, which were photographs of the inside of the skin on T.W.'s chest wall. She explained that the two photographs showed the same small bruise that was seen on the outside of the chest wall. The two photographs also showed rulers measuring the length and width of the small bruise. She was asked about People's Exhibit 103A, a photograph taken of the inside of T.W.'s scalp during the autopsy. She opened T.W.'s scalp and cranium to determine whether he had sustained any head injuries, a possibility suggested by the defendant's claim that T.W. hit his head on the refrigerator. As noted previously, she did not find any evidence of an injury.

¶ 30    Dr. Nanduri opined that, "A minor impact would cause smaller bruises, like [the] one seen here, which is a lower velocity and—low velocity and low speed type of injuries." She explained that she reached this conclusion because T.W. did not suffer any broken ribs or any injuries to his internal organs, including his heart.

¶ 31    Dr. Nanduri then testified about commotio cordis, the condition she determined led to T.W.'s death. She explained that commotio cordis, which is a Latin term meaning "agitated heart," is a rare condition that can happen in a child whose chest wall is not fully formed. When force is applied to the left ventricle area of the child's heart "within a particular period of the cardiac cycle," it causes the child's heart to stop. Dr. Nanduri further explained that the entire cardiac cycle takes only one second, and window of vulnerability within that cycle is a period of 15 milliseconds just before the T-wave begins.

9

She noted that commotio cordis is a rare event because this window of vulnerability is so small. She also testified that the force necessary for commotio cordis to occur is between 20 and 50 miles per hour.

¶ 32    Dr. Nanduri was asked what she determined to be the cause of T.W.'s death. She replied, "Cardiac rhythm disturbances precipitated by blunt force trauma to the chest—commotio cordis."

¶ 33    Dr. Christopher Wangard, the director of pediatrics at Cardinal Glennon Hospital, examined and treated Z.F. at the emergency room on the evening T.W. died. He testified that he performed a head-to-toe examination on Z.F., during which he observed multiple bruises on Z.F.'s legs and buttocks, as well as "a couple of other scattered bruises elsewhere." He testified that Z.F. "had really too many bruises to count—at least dozens."

¶ 34    Dr. Wangard noted that Z.F. had both linear bruises and round bruises. He opined that the linear bruises were likely the result of child abuse. He reached this conclusion based on both the number and patterns of the bruises. He explained that linear bruises are consistent with child abuse because they indicate that the child was struck by an object with a straight edge, such as a belt or strap.

¶ 35    Finally, Dr. Wangard testified that the bruises he observed were in different stages of healing. This indicated that they had been inflicted at different times. On cross-examination, Dr. Wangard acknowledged that his examination of Z.F.'s chest was unremarkable.

¶ 36    The defendant requested that the jury be given instructions and a verdict form on involuntary manslaughter, a lesser included offense of first degree murder. The trial court

granted this request and instructed the jury on first degree murder, involuntary manslaughter, and aggravated battery of a child. The jury found the defendant guilty of first degree murder and aggravated battery of a child. The court subsequently sentenced him to concurrent sentences of 30 years' imprisonment for murder and 3 years' imprisonment for aggravated battery of a child. The defendant appeals.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, the defendant argues that (1) the evidence was insufficient to prove that he knew his conduct created a strong probability of death or great bodily harm, which is an essential element of the offense of first degree murder; (2) the trial court abused its discretion in granting the State's joinder motion; and (3) the court abused its discretion in admitting autopsy photographs that the defendant contends were prejudicial. Dispositive of this appeal, we find that the evidence was insufficient to support a conviction of first degree murder, and we need not address the defendant's remaining arguments.

¶ 39    The defendant argues that the State failed to prove him guilty of first degree murder beyond a reasonable doubt where the evidence showed that he committed involuntary manslaughter when he caused the death of T.W. Specifically, the defendant contends that the evidence was insufficient to prove that he knew his conduct created a strong probability of death or great bodily harm to T.W. See 720 ILCS 5/9-1(a)(2) (West 2014). We agree.

¶ 40    When considering a challenge to the sufficiency of the evidence, this court must view all the evidence in the light most favorable to the prosecution. *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010). We must determine whether the evidence was sufficient for any reasonable trier of fact to find the essential elements of the crime beyond a reasonable

11

doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Though we may not substitute our judgment for that of the jury (*People v. Reeves*, 228 Ill. App. 3d 788, 798 (1992)), we will reverse a conviction where the evidence is so improbable, unreasonable, or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 211 (2004); *Collins*, 106 Ill. 2d at 261.

¶ 41    To prove a defendant guilty of first degree murder, the State must prove that (1) defendant's conduct caused the death of the victim, (2) he acted knowing that his conduct created a strong probability of death or great bodily harm, and (3) the killing was not justified. See 720 ILCS 5/9-1(a)(2) (West 2014). The State must prove each element beyond a reasonable doubt. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 42    As to the second element, knowledge is a mental state and must ordinarily be proven through circumstantial evidence. *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 20. The requisite knowledge for first degree murder can be inferred from evidence that defendant engaged in conduct that has the "natural tendency" to cause death or great bodily harm. *Reeves*, 228 Ill. App. 3d at 798. The distinguishing element between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting in a victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). In opposition to first degree murder, involuntary manslaughter requires a less culpable mental state. *Id*. Murder requires knowledge, where involuntary manslaughter requires recklessness. *People v. Givens*, 364 Ill. App. 3d 37, 44 (2005). Knowledge constitutes a conscientious awareness that one's conduct is practically certain to cause a particular result. *People v. Leach*, 405 Ill. App. 3d 297, 312 (2010). Recklessness, on the other hand, occurs where defendant

12

"consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2014). "In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." *DiVincenzo*, 183 Ill. 2d at 250. Recklessness, therefore, involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *Id.*

¶ 43    Here, the defendant argues that it was not proven beyond a reasonable doubt that he had the requisite mental state for first degree murder. He emphasizes that Dr. Nanduri testified that the bruise on T.W.'s chest resulted from a "low velocity, low speed" punch and reasons that a single low velocity, low speed punch does not ordinarily create a strong probability of death or great bodily harm. The bruise's small size also indicated that it was caused by a low impact. Furthermore, the rarity of commotio cordis and the fact that death only occurred due to force being applied during a 15-millisecond window within the cardiac cycle indicates that he lacked the requisite intent. He could not possibly have anticipated that the precise timing of his punch would fall within that brief window or that T.W. would die as a result of a single low speed punch. Alternatively, the State argues that it did not have to prove that the defendant anticipated that the precise timing of his punch would cause commotio cordis, and it did not have to prove that he knew T.W. would die. Instead, it was only required to prove that the defendant knew that his actions were reasonably likely to cause great bodily harm to T.W.

13

¶ 44    The evidence overwhelmingly supported the conclusion that the defendant did not anticipate T.W.'s death nor any great bodily harm caused to him. Both the lay evidence and expert testimony demonstrated that the defendant neither intended nor anticipated the result of his actions; the result itself was unexpected and unlikely. Specifically, there was testimony that the bruise on T.W.'s chest resulted from a "low velocity, low speed" punch. However, in order for commotio cordis to occur, the force applied must be between 20 and 50 miles per hour. This medical testimony as to the minimal bruising on T.W.'s chest, as well as the millisecond-long window in which a blow would have been fatal, are unsatisfactory in establishing beyond a reasonable doubt that the defendant had the requisite intent for first degree murder. Therefore, the verdict was wholly unreasonable.

¶ 45    In so finding we conclude that a reasonable trier of fact could not have reached the conclusion of the jury in this case. See *Reeves*, 228 Ill. App. 3d at 798. The defendant therefore requests that this court reduce his first degree murder conviction. As involuntary manslaughter was a lesser included charge on which the jury was instructed, we exercise our authority and reduce the defendant's conviction to involuntary manslaughter. See *Jones*, 404 Ill. App. 3d at 750. Therefore, under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), we modify the defendant's conviction to involuntary manslaughter. We also remand for resentencing on involuntary manslaughter.

¶ 46                                    III. CONCLUSION

¶ 47    For the foregoing reasons, we affirm as modified the defendant's conviction and remand for sentencing on involuntary manslaughter.

14

¶ 48    Affirmed as modified and remanded with directions.


¶ 49    JUSTICES CATES, dissenting:

¶ 50    The jury's verdict in this case was for first degree murder of a child under 12 years of age (720 ILCS 5/9-1(a)(2) (West 2014)). The jury was given instructions on both murder and involuntary manslaughter, and it ultimately found, based upon all the evidence, that a murder conviction was warranted. It is not within the purview of this court to reweigh the evidence already considered by the jury and disregard the verdict of the factfinders. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, a reviewing court will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *Id*. In my view, there was overwhelming evidence to support the defendant's conviction for murder. Therefore, I must strongly dissent from the majority's decision to set aside the jury's verdict of first degree murder and reduce the defendant's conviction to that of involuntary manslaughter. Further, under the unique circumstances presented in this case, I find that the trial court's decision to grant the State's motion for joinder of the offenses of murder and aggravated battery of a child was proper. Finally, I find that the trial court's decision to admit the autopsy photographs at issue was within its discretion, and not an abuse of discretion.

¶ 51    In arriving at the decision to reduce the defendant's conviction from murder to involuntary manslaughter, the majority finds that there was insufficient evidence to prove beyond a reasonable doubt that the defendant knew his act of punching a five-year-old child in the chest created a strong probability of great bodily harm. In so finding, the

15

majority has not considered all of the evidence revealing what was happening in the home of T.W. and his brother, Z.F.

¶ 52 A key part of the evidence was the conduct of the defendant, not just on the date of T.W.'s death, but in the days leading up to his death. First, there was no dispute that the defendant was the disciplinarian in the home. Toria testified that she allowed her boys to be disciplined by the defendant, because he was the "man of the house." Toria knowingly allowed her children to be "whoop[ed]" with a belt.

¶ 53 In a videotaped interview with police, the defendant admitted that he was the disciplinarian, and that his methods of punishment varied, from having the boys do push-ups, sit in the corner, hold their arms in the air, or he would punch them in the chest or use a belt on them. The defendant also admitted that the night before the death of T.W., the defendant spanked both boys with a belt and punched each of one of them in the chest—one time. The defendant opined that punching a child in the chest was the "most effective" form of discipline for correcting behavior. Despite this testimony, the defendant claimed he did not see any marks on the children. Based upon the testimony and physical evidence, the jury could have reasonably found that the defendant's claim that he saw no markings on the children was not credible.

¶ 54 The facts in this case demonstrate that the defendant, a large man approximately 6 feet tall and 185 pounds, regularly punched or used a belt on two defenseless children, ages seven and five, while their mother stood by in apparent approval of the various forms of punishment. The defendant's repeated acts of brutal force upon the children, resulting in the murder of one child and the aggravated battery of the other, allow for only one

16

reasonable conclusion—that these acts were inflicted for the same purpose—exacting obedience by inflicting great bodily harm on two young children. This conclusion is reinforced by the statements made by the defendant, himself, who testified that he thought a punch in the chest was the "most effective" way of exacting obedience. In my view, the jury could have reasonably found that punch to the chest of a five-year-old child, inflicted for failing to help his brother pick up trash, was an act intended to cause great bodily harm, if not death. After all, T.W. weighed only 60 pounds and stood 45 inches tall, when the defendant took aim for the punch that interrupted T.W.'s beating heart.

¶ 55    Dr. Nanduri testified that the bruise seen on the interior wall of T.W.'s chest in the autopsy photo was caused by blunt force trauma. In her words, "something struck that part of the chest causing the bruise." Dr. Nanduri opined that T.W.'s cause of death was "[c]ardiac rhythm disturbances precipitated by blunt force trauma" to the chest, a condition called "commotio cordis," and that the manner of death was homicide. She explained that this type of injury is often seen in children because the chest wall is not fully formed and is compressible. She noted that the injury has been found to occur in sports activities, where, for example, a player is struck in the chest by a baseball or a puck, but that it can also occur as a result of being struck by a fist or karate blow. Dr. Nanduri opined that the bruise to T.W.'s chest wall resulted from a "low speed, low velocity type of force." When asked to clarify the force, Dr. Nanduri testified that, statistically, studies have demonstrated that an impact force of 30 to 50 miles per hour resulted in a 70% rate of ventricular fibrillation, that the probability of ventricular fibrillation decreased as the impact force declined, and that the condition is not found with impact force less than 20 miles per hour.

17

Based on this testimony and the autopsy evidence, the jury could have reasonably concluded that the impact force of the punch necessary to cause the bruising of the chest wall and the cardiac rhythm disturbance would have been at least 20 miles per hour, and more likely nearing 30 miles per hour. Additionally, Dr. Nanduri observed evidence of other abuse. When she performed the autopsy, she found evidence of bruising on the left buttock and a small area of hemorrhage on the back, at the right side. The jury could have concluded that those findings were consistent with the "whooping" T.W. received the night before.

¶ 56 Whether a defendant is guilty of first degree murder or involuntary manslaughter is ordinarily a question for the trier of fact. *People v. DiVincenzo*, 183 Ill. 2d 239, 253 (1988), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882; *People v. Bartall*, 98 Ill. 2d 294, 307 (1983). The key difference between involuntary manslaughter and first degree murder lies in the mental state that accompanies the conduct resulting in the victim's death. *DiVincenzo*, 183 Ill. 2d at 249. The issue is whether the defendant had the requisite mental state to sustain the conviction for first degree murder. An individual who kills another by punching and kicking can be convicted of first degree murder if he acts with the requisite mental state. *Id*. at 254; *People v. Brackett*, 117 Ill. 2d 170, 180 (1987). Significantly, inferences as to a defendant's mental state are a matter particularly within the province of the jury. *DiVincenzo*, 183 Ill. 2d at 253.

¶ 57 Based upon the evidence presented at trial, including the defendant's own words, the jury could have reasonably found that the defendant intended to punch T.W. in the chest that day, and that the defendant knew that his act of punching T.W. squarely in the chest,

near the heart, would create a strong possibility of great bodily harm or death. The majority concludes that the defendant did not anticipate or intend the result of his action, placing great emphasis on the fact that the defendant threw a single punch that landed during a 15-millisecond window within the cardiac cycle resulting in the rarity of commotio cordis. *Supra* ¶ 44. The jury, however, heard the defendant's testimony, along with Dr. Nanduri's testimony regarding the extent of the injuries to T.W. and the cause and the manner of his death. Additionally, the jury received an instruction on involuntary manslaughter. It was within the province of the jury to weigh all of the evidence and to make inferences as to a defendant's mental state. In my view, the evidence introduced was overwhelming, beyond a reasonable doubt, to prove the defendant committed the act of murder. Taking all of the evidence in a light most favorable to the verdict, there is no reason to disturb the jury's verdict, and so I respectfully dissent.

¶ 58    The defendant also alleges that the trial court abused its discretion in granting the State's motion for joinder. He argues that the two charges were not part of the same comprehensive transaction, and that he was unfairly prejudiced.

¶ 59    A defendant may be placed on trial in one proceeding for separate offenses if the offenses are "based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2014). There are no precise criteria for determining whether separate offenses are part of the same comprehensive transaction. *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990). Nevertheless, "a common method of operation, proximity in time and location of offenses, a common type of victim, similarity of offenses, and the identity of evidence to demonstrate a link between the

19

offenses are some of the factors the courts have considered." *Id*. A trial court has broad discretion in determining whether charges may be joined, and the court's decision will not be reversed on review absent an abuse of that discretion. *Id*. A trial court abuses its discretion when its decision is "arbitrary, fanciful, or unreasonable," or where no reasonable person would take the trial court's view. (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 60     After reviewing the record, I find that the facts clearly established a criminal design of exacting obedience through brutal force, whether it was inflicting pain and welts from a belt, or using a punch to the chest, where there is obviously very little fat to absorb the force of a 20- to 50-mile-per-hour blow. All of the acts of brutality occurred in close proximity to each other. I find that the facts of this case are akin those in *Trail*, 197 Ill. App. 3d 742. Here, as in *Trail*, the offenses involved similar victims and similar circumstances, and the offenses occurred within the same household during a closely related period of time. *Id*. at 746.

¶ 61     Further, some of the evidence surrounding the aggravated battery was admissible under section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2014)), and the defendant has not shown that the admission of this evidence was unfairly prejudicial. When evidence of other crimes evidence is properly admissible, the potential prejudice to a defendant of having the jury decide two separate charges is greatly diminished because the jury is going to be receiving evidence about both charges anyway. *Trail*, 197 Ill. App. 3d at 746.

20

¶ 62    Section 115-7.4(a) specifically allows "evidence of the defendant's commission of another offense or offenses of domestic violence." 725 ILCS 115-7.4(a) (West 2014). The Illinois Supreme Court has considered this statute and found that its enactment was an effort by the legislature to abrogate the long-standing common law rule regarding the admissibility of "other crimes evidence." See *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010).

¶ 63    In *Dabbs*, the defendant was charged with domestic violence and unlawful restraint of his girlfriend, DeWeese. *Id*. at 280. At trial, the girlfriend testified that she and the defendant came home from a video store, and that DeWeese went to bed, while the defendant stayed up drinking beer. DeWeese was later awakened by the defendant, who grabbed DeWeese out of her bed, dragged her by the hair into the bathroom, and pushed her head into the toilet, hitting her head on the rim of the bowl. Also, at trial, the defendant's ex-wife was allowed to testify that she was struck repeatedly with a belt, after the defendant got drunk. *Id*. at 282. The defendant in *Dabbs* claimed that the admission of the other crimes evidence was unfairly prejudicial, and that the statute was unconstitutional. In affirming the defendant's conviction, the supreme court found that section 115-7.4 was constitutional, and that evidence of other crimes of domestic violence is admissible if the probative value is not outweighed by the risk of undue prejudice. *Id*. at 294. The "other offenses" evidence in *Dabbs* is more attenuated than the evidence presented here.

¶ 64    Under section 115-7.4(a) of the Code, the evidence pertaining to the assault on Z.F. was evidence of an act of domestic violence, and therefore admissible on the murder charge. The acts pertaining to the assault of Z.F. and the murder of T.W. were part of a

21

comprehensive transaction. Based on this record, the trial court did not abuse its discretion in granting the State's motion for joinder.

¶ 65   Finally, the defendant contends that he was prejudiced by the introduction of the autopsy photographs. A determination of whether a jury should be allowed to see photographs of a decedent is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *People v. Heard*, 187 Ill. 2d 36, 76-77 (1999). As previously noted, a finding of an abuse of discretion with respect to an evidentiary ruling is a high threshold to overcome, and such a finding will not result unless it can be said that no reasonable person would have taken the view adopted by the trial court. *Illgen*, 145 Ill. 2d at 364; *Trail*, 197 Ill. App. 3d at 746.

¶ 66   Autopsy photographs, by their very nature, might be characterized as gruesome and prejudicial. Nevertheless, our courts have repeatedly allowed the admission of such photographs if they show the nature and extent of injuries; the position and location of the body; the manner and cause of death; and, aid in understanding the testimony of a pathologist or other witness. *Heard*, 187 Ill. 2d at 77. If the photographs could aid the jury in understanding a witness's testimony, they may be admitted even if cumulative of that testimony. *Id.*

¶ 67   Here, the defendant initially filed a motion *in limine* to prevent the State from introducing 66 photographs. The State, however, requested the trial court allow it to introduce 14 autopsy photographs at trial. After a hearing on the matter, the trial court ruled that it would allow the State to introduce only eight of those photographs. At trial, the State moved to admit and publish those eight photographs to the jury, but the court held that it

would only allow the State to publish those photographs that were responsive to the State's questions directed to Dr. Nanduri, the pathologist who conducted the autopsy on T.W. In eliciting Dr. Nanduri's testimony, the State published only three of the autopsy photographs to the jury—People's Exhibits 94, 95, and 103(a), all of which were subsequently admitted into evidence. The other five photographs that the State would have been permitted to introduce and publish to the jury, People's Exhibits 59, 60, 70, 77, and 106(a), were made part of the trial court record, but they were not sent back with the jury, nor were they shown to the jury at any time.

¶ 68    People's Exhibit 103(a) was admitted through the testimony of Dr. Raj Nanduri. This photograph depicted T.W.'s scalp, showing the cranium cap before the cranium was opened. There were no internal injuries noted on the head or brain of the child. Other than the blunt force injury to the chest, Dr. Nanduri did not observe any other injury on T.W.'s body that could have caused his death. This photograph was relevant because the defendant testified that when he punched T.W. in the chest, T.W. fell and hit his head against the refrigerator. Therefore, the lack of any autopsy findings related to the scalp tissue, such as bruising, was relevant to the defendant's credibility.

¶ 69    The other two photographs at issue, People's Exhibits 94 and 95, depicted the condition of the chest wall and were also admitted through the testimony of Dr. Nanduri. Again, these photos were relevant to show the nature and degree of the injury, and they aided the jury in understanding Dr. Nanduri's testimony regarding the manner and cause of death.

23

¶ 70 The record demonstrates that the trial court took great care to prevent any prejudice in the admission of the autopsy photographs, even requiring that one photograph be cropped to avoid undue prejudice to the defendant. In limiting the number of autopsy photographs that could be admitted into evidence and published to the jury, the trial court balanced the right of the State to present its case with the rights of the defendant to a fair trial. The trial court did not abuse its discretion in the admission of the autopsy photographs.

¶ 71 For the reasons stated, I would affirm the defendant's conviction for murder. Accordingly, I respectfully dissent.